Ernest E. EVANS, Plaintiff–Appellant,

v.

SAFECO LIFE INSURANCE COMPANY,
Personal Security Option Program—
Lockheed Special Accident Insurance
Plan, Lockheed Corporation, Defen-
dants–Appellees.

No. 88–6299.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 14, 1989.

Decided Oct. 19, 1990.

Kenneth C. Blickenstaff, Lipsky & Blickenstaff, Claremont, Cal., for plaintiff-appellant.

William V. McTaggart, Parker, Milliken, Clark, O'Hara & Samuelian, Los Angeles, Cal., for defendant-appellee Safeco Life Ins. Co.

Donald B. Wallace, O'Melveny & Myers, Los Angeles, Cal., for defendants-appellees Lockheed Corp. and Personal Security Option Program—Special Acc. Ins. Plan.

Before SCHROEDER, BOOCHEVER and BEEZER, Circuit Judges.

## PER CURIAM:

Ernest Evans (Evans) appeals the district court's dismissal of his second amended complaint under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461 (1982 & Supp. IV (1987)) for the defendants' failure to pay insurance benefits allegedly due Evans for the death of his former wife's natural son, Gerald Evans (Gerald). We affirm.

### I

In 1986, Evans was employed by Lockheed Corporation and enrolled in the Lockheed Special Accident Insurance Plan. Evans enrolled in the family plan, which covered the employee's spouse and children. The handbook to this plan states "[t]he family plan provides coverage for your spouse and your children who are unmarried and under age 19 (or under age 23 if registered full-time students wholly dependent on you for financial support)." In July of 1986, Gerald Evans, the natural son of Evans' ex-wife, died in an accident. Evans submitted a claim to Lockheed for Gerald's death, which was denied by Safeco (the issuer of the group policy) on the ground that Gerald was not Evans' child.

The following facts are taken from Evans' second amended complaint. In 1968, Evans and Bertha Graham (Gerald's natural mother) began to live together, and Gerald Deon Graham Evans was born in December of that same year. In 1970, Evans and Bertha Graham married. They separated in 1973, and were divorced in

1980. Bertha Graham remarried sometime after the divorce.

Evans admits in his complaint that he does not know if Gerald was his natural son, and Evans never established paternity in Gerald's lifetime. Evans always considered Gerald to be his natural son and treated Gerald accordingly. Even after Evans' separation from Bertha Graham, Gerald's natural mother, and until Gerald's death, Evans and Gerald remained close. After Bertha Graham remarried, Evans admits that Gerald lived with his mother but alleged that "Gerald regularly spent two or three nights a week with [Evans], and [Evans] regularly contributed to Gerald's support."

Evans originally sued in state court alleging violations of state law for the defendants' failure to pay the disputed benefits, but the defendants removed the action to federal court. The district court ordered Evans to file an amended complaint to restate the first cause of action as an ERISA claim. Evans filed his first amended complaint asserting ERISA claims against Lockheed as the administrator of the plan, Safeco as the issuer of the group policy, and against the Lockheed Special Accident Insurance Plan.

The district court granted the defendants' motion to dismiss the first amended complaint without prejudice on the ground that Evans did not allege sufficient facts to support a stepson theory, but it granted leave to amend so that Evans could attempt to allege facts sufficient to establish a "de facto or psychological" parent-child relationship.

The district court dismissed Evans' second amended complaint on the ground that Evans and Gerald "did not share a parent-child relationship" and therefore Evans could not recover under the terms of the policy, which covered only Evans, his spouse, and his children. The district court granted the defendants' motion to dismiss with prejudice. Evans filed a timely notice of appeal.

Evans' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6). We review a dismissal for failure to state a claim de novo. *See, e.g., Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir.1986). A complaint should not be dismissed "unless it appears to a certainty that the plaintiff would not be entitled to relief under any set of facts that could be proved. All material allegations in the complaint are to be taken as true and construed in the light most favorable to the non-moving party." *Id.* (citation omitted).

II

■ The threshold question presented here is what law applies to interpret the terms of an ERISA insurance policy. We recently explained in *Kunin v. Benefit Trust Life Insurance Co.*, 898 F.2d 1421 (9th Cir.1990), *amended*, 910 F.2d 534, 539 (9th Cir.1990) that claims brought under section 502 of ERISA are federal claims, not state contract law claims. In *Kunin*, we did not decide whether to incorporate state law into the federal common law or whether to fashion uniform federal rules. Today we hold that the interpretation of ERISA insurance policies is governed by a uniform federal common law.

Our analysis begins with the statute. ERISA contains one of the broadest preemption clauses ever enacted by Congress. Generally, the act supersedes state laws which "relate to" employee benefit plans. 29 U.S.C. § 1144(a) (1982). However, ERISA also provides that "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance." 29 U.S.C. § 1144(b)(2)(A) (saving clause).

In *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) and in *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), the Supreme Court employed a two-part test to determine when laws regulate insurance under ERISA's saving clause. First, the Court looked to a common-sense view of the language of the saving clause. 471 U.S. at 740, 105 S.Ct. at 2389; 481 U.S. at 48, 107 S.Ct. at 1553. Second, it made use of the case law interpreting the phrase

"business of insurance" under the McCarran–Ferguson Act. 15 U.S.C. § 1011 et seq.

The criteria used to interpret the McCarran–Ferguson Act include (a) whether the practice has the effect of transferring or spreading a policyholder's risk, (b) whether the practice is an integral part of the policy relationship between the insurer and the insured, and (c) whether the practice is limited to entities within the insurance industry. *See generally,* Annotation, *Construction and Application of Preemption Exemption, Under Employment Retirement and Income Security Act (29 U.S. C.A. § 1001 et. seq.), for State Laws Regulating Insurance, Banking, or Securities (29 U.S.C.A. § 1144(b)(2)),* 87 A.L.R.Fed. 797 (1988).

We applied the Supreme Court's test in *Kanne v. Connecticut General Life Insurance Co.,* 867 F.2d 489, 494 (9th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989) to determine whether ERISA preempts state decisional laws which interpret insurance policies.[1] The *Kanne* court reasoned:

> California's common law of contract interpretation is not "specifically directed toward [the insurance] industry." Nor generally does it effect risk spreading or concern the policy relationship between the insurer and the insured beyond that to which the parties have agreed in the insurance contract. Accordingly, we conclude that California's common law of contract interpretation is not a law that "regulates insurance," and therefore is not saved from preemption.

*Id.*

 It would make little sense to adopt a state law rule, which Congress has chosen to preempt, as a matter of federal common law. The saving clause constitutes the exclusive list of state laws which are not preempted by ERISA. 29 U.S.C. § 1144(b)(2)(A) (1982). In *Kanne,* we held that state laws of insurance policy interpretation do not qualify for the saving clause exception and are preempted. If we were to preserve 50 different state laws of insurance policy interpretation as federal common law, we would in effect add an item to the saving clause which we have already said that Congress did not mean to include.

Moreover, ERISA's legislative history, discussed in a plethora of ERISA preemption decisions, undeniably demonstrates that Congress expects uniformity of decisions under ERISA. *See Pilot Life,* 481 U.S. at 56, 107 S.Ct. at 1557 ("[t]he *uniformity* of decision which the Act is designed to foster will help administrators, fiduciaries and participants to predict the legality of proposed actions without the necessity of reference to varying state laws") (quoting legislative history) (emphasis added); *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 9, 107 S.Ct. 2211, 2216, 96 L.Ed.2d 1 (1987) (ERISA's preemption provision was designed to eliminate the "threat of conflicting or inconsistent State and local regulation of employee benefit plans") (quoting legislative history); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 99–100 n. 20, 103 S.Ct. 2890, 2901 n. 20, 77 L.Ed.2d 490 (1983) ("the emergence of a comprehensive and pervasive Federal interest and the interests of *uniformity* with respect to interstate plans required ... the displacement of State action in the field of private employee [welfare and pension benefit plans]") (quoting legislative history) (emphasis added); *Menhorn v. Firestone Tire & Rubber Co.,* 738 F.2d 1496, 1500 (9th Cir.1984) ("The courts are directed to formulate a *nationally uniform federal common law* to supplement the explicit provisions and general policies set out in ERISA") (emphasis added).

In addition, strong parallels can be drawn between ERISA and the Labor Management Relations Act (LMRA), 29 U.S.C. § 141, *et seq.,* which courts have consistently interpreted to empower the federal courts to develop a uniform federal common law where no statutory provisions are directly applicable. *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 456–57, 77 S.Ct. 912, 917–18, 1 L.Ed.2d 972

---

1. Decisional law which regulates insurance falls under the saving clause. *See* 29 U.S.C. § 1144(c)(1); *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. at 48 n. 1, 107 S.Ct. at 1553 n. 1.

(1957); *Rehmar v. Smith,* 555 F.2d 1362, 1366–67 (9th Cir.1976). The purposes and fields of regulation of ERISA and the LMRA are similar.

In sum, we agree with the conclusion of the First Circuit in *Sampson v. Mutual Benefit Life Insurance Co.,* 863 F.2d 108, 109–110 (1st Cir.1988), that the interpretation of an ERISA insurance policy is "governed by a *uniform* body of federal law." (emphasis added).

### III

■ We must next determine whether, as a matter of law, an insured's former spouse's child may be included within the definition of the term "children" in ERISA insurance policies. Evans argues that the word "children" is ambiguous and should therefore be construed in his favor to encompass Gerald. *Cf. Kunin,* 910 F.2d 534 (concluding that the term "mental illness" used in an ERISA insurance policy is ambiguous insofar as autism is concerned). We disagree.

We interpret terms in ERISA insurance policies "in an ordinary and popular sense as would a [person] of average intelligence and experience." *Allstate Insurance Co. v. Ellison,* 757 F.2d 1042, 1044 (9th Cir. 1985) (applying Alaska law). We will "not artificially create ambiguity where none exists." *Id.* "If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy." *Id.* The meaning of the word "children" is plain to us, and we refuse to adopt an unduly expansive interpretation of that word.

■ Several courts and commentators which have examined the meaning of the word "children" in the context of insurance claims have concluded that it does not encompass stepchildren. *See National Home Life Assurance Co. v. Patterson,* 746 P.2d 696 (Okl.App.1987) ("child" does not apply to an unadopted stepchild); *Laseter v. Laseter,* 157 Ark. 273, 247 S.W. 1049 (1923) (stepmother was not an eligible beneficiary because she was not part of stepson's family because she did not live

with or depend upon him); *Supreme Lodge's Order of Mutual Protection v. Dewey,* 142 Mich. 666, 106 N.W. 140 (1906) (stepfather was not an eligible beneficiary because he was not a member of his stepdaughter's family because they never lived in the same home); J. Greider, M. Crawford, W. Beadles, *Law and the Life Insurance Contract* 273 (5th ed. 1984) ("The courts are also generally agreed that the term *children* does not include grandchildren and stepchildren"). Some courts have even held that stepparents cannot have an insurable interest in stepchildren. *See, e.g., Commonwealth Life Insurance Co. v. Wood's Adm'x,* 263 Ky. 361, 92 S.W.2d 351 (1936) (stepmother has no insurable interest in life of stepchild); *United Security Life Insurance and Trust Co. of Pennsylvania v. Brown,* 270 Pa. 273, 113 A. 447 (1921) (stepparent had no insurable interest in stepson unless the stepson was a creditor of or dependent upon the stepparent). *See also* 2 J. Appleman, *Insurance Law and Practice* § 791 at 209 (1975) ("The tendency of the courts has been, however, to deny recovery to step-parents on insurance effected upon the lives of step-children, unless it appeared, at least, that they resided together as members of the same family"); 3 G. Couch, *Couch on Insurance* § 24:130 (2d ed. 1984) ("A step-parent beneficiary has no insurable interest in the life of his stepson, unless he is a creditor, or is dependent upon, or responsible for, his support").

Since we agree that "children" does not encompass step-children, we certainly do not believe that it encompasses a former spouse's child. With respect to life insurance policies, Couch has argued that divorce terminates the affinity relationship between former stepparent and stepchild: "The granting of a divorce may also have the effect of making ineligible children of the divorced wife by a former marriage. As an illustration, a divorce granted the wife of the insured operates to terminate any relationship by affinity between her child by a former marriage and the insured whereunder such child might claim under the policy as a stepchild of the insured." 4

G. Couch, *Couch on Insurance* § 27:128 (2d ed. 1984). *See also Brotherhood of Locomotive, Firemen and Enginemen v. Hogan*, 5 F.Supp. 598 (D.Minn.1934) (after the insured and his wife were divorced, the affinity relationship between the wife's son from a previous marriage and the insured terminated because the marriage between the insured and his ex-wife did not produce any children).

We realize that some courts have interpreted the word "children" much more expansively. *See, e.g., Hilliker v. Dowell*, 54 Mich.App. 249, 252, 220 N.W.2d 712, 714 (1974) (stepchildren included within insurance beneficiary designation "children"). However, terms in insurance policies are not rendered ambiguous merely because they are the subject of conflicting judicial interpretations. *See Allstate Insurance Co.*, 757 F.2d at 1044–45 (9th Cir.1985). We believe the word "children" used in Evans' policy is not ambiguous. We hold that "children" does not include a former spouse's child.

AFFIRMED.

SCHROEDER, Circuit Judge, Concurring in Part and Dissenting in Part:

I agree with the per curiam opinion's conclusion that a person who is not related either to the insured or to the insured's lawful spouse is not a "child" within the meaning of the insurance policy. No court in any state has ever reached a contrary decision. The authority upon which Judge Boochever relies, *In re Bordeaux' Estate*, 37 Wash.2d 561, 225 P.2d 433 (1950), deals with the phrase "child or step-child," and in a tax rather than an insurance policy context.

I dissent from the per curiam opinion's further holding, however, that ERISA requires us to develop, on our own, an entirely new federal common law of insurance contract interpretation. This case presents a garden variety question of the meaning of a word in an insurance policy, and the state courts have been deciding such questions routinely for generations. The possibility of departing from state law to create a new federal common law was never even raised by the parties in this case.

It is of course correct that because of ERISA's broad preemption provisions, this case arises under federal law, and state law does not automatically apply. The question, however, is whether as a matter of federal law we choose to follow the state law of contract interpretation. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728–29, 99 S.Ct. 1448, 1458–59, 59 L.Ed.2d 711 (1979). The majority's approach invites federal lawsuits to reconsider every issue of insurance contract interpretation that has ever been litigated in the state courts. In this era of an overburdened federal judiciary, we should not do that unless the congressional mandate is clear. It is not. Indeed there is every indication that Congress did not intend to displace established state law principles of insurance contract construction. *See* 29 U.S.C. § 1144(b) (mandating compliance with state laws regulating insurance).

The authorities cited in the per curiam opinion do not support the conclusion that we must reject state law and develop a new federal common law. Those cases do not concern the interpretation of a word or phrase in a contract as this case does. The portion of the *Kanne* case quoted in the majority opinion holds only that to the extent that a claim was based on application of California contract law principles, the entire claim was preempted by federal law. *Kanne v. Connecticut Gen. Life Ins. Co.*, 867 F.2d 489, 494 (9th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989). The case does not purport to deal with creating a new federal common law of insurance contract interpretation.

*Sampson v. Mutual Benefit Life Insurance Co.*, 863 F.2d 108 (1st Cir.1988), deals with problems of administering a health insurance policy and reviewing the trustee's interpretation under an ERISA plan. It concerns ERISA's civil enforcement procedures set forth in 29 U.S.C. § 1132(a), not contract interpretation.

Finally, the considerations which led to the development of a federal common law

interpreting collective bargaining agreements in *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), do not apply in this situation. The Court in *Lincoln Mills* was concerned about the policies underlying collective bargaining agreements which differed dramatically from the policies underlying any comparable body of state law; thus there was no readily available body of developed labor relations law to which federal courts could turn. The same cannot be said about insurance policies.

I would affirm the district court on the basis of the settled principles of insurance contract interpretation applied by the district court.

BOOCHEVER, Circuit Judge, dissenting in part:

I concur in the *per curiam* opinion with the exception of Part III. I do not agree that the word "children" as used in the insurance policy is unambiguous. Because "children" can be construed to include "stepchildren," I believe the ambiguity in the ERISA policy should be construed in favor of Evans, and that it was error to dismiss Evans' complaint.

Numerous authorities have noted or held that stepchildren may be included as children in insurance contracts. *See Hummel v. Supreme Conclave Improved Order Heptasophs*, 256 Pa. 164, 169–71, 100 A. 589, 590 (1917); *New York Life Ins. Co. v. Beebe*, 57 F.Supp. 754, 757 (D.Md.1944) (depending upon circumstances of use, "child" may include stepchildren (interpreting California law)); *Martin v. Aetna Life Ins. Co.*, 73 Me. 25, 27 (1881) ("[t]he word 'child' in legal documents ... may include grandchildren, step-children, children of adoption, & c."); *Hilliker v. Dowell*, 54 Mich.App. 249, 252, 220 N.W.2d 712, 714 (1974) (stepchildren included within insurance beneficiary designation "children"); *Lehman v. Lehman*, 215 Pa. 344, 351, 64 A. 598, 600 (1906) (dicta that "the child of the widow by her former husband would be let in on the same plane with the donor's own children"); *Transamerica Occidental Life Ins. Co. v. Burke*, 368 S.E.2d 301, 305

(W.Va.1988) ("Courts have held that a stepchild was a 'child,' 'orphan' or 'relative' under the beneficiary-designation provisions of an agreement or statute involving death benefits.").

These cases span over one hundred years, and they are not, as the majority would characterize them, merely "conflicting judicial interpretations." Opinion at 1442. Instead, they indicate that the word "children" is elastic, admitting more than biological children. This elasticity reflects social conditions today, when families are more fluid and the trend in the law has been to extend to stepchildren those rights and privileges accorded biological children. *See Klossner v. San Juan County*, 93 Wash.2d 42, 46, 605 P.2d 330, 332 (1980).

Under these circumstances, Evans' policy should be construed in his favor to encompass stepchildren in the word "children." This is particularly appropriate here, as Evans alleges he specifically named Gerald as an insured upon enrollment in the plan. As this court recently stated in *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 540 (9th Cir.1990).

> In light of the drafters' expertise and experience, the insurer should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand; if it fails to do this, it should not be allowed to take advantage of the very ambiguities that it could have prevented with greater diligence. Moreover, once the policy language has been drafted, it is not usually subject to amendment by the insured, even if he sees an ambiguity; an insurer's practice of forcing the insured to guess and hope regarding the scope of coverage requires that any doubts be resolved in favor of the party who has been placed in such a predicament.

Because the word "children" is ambiguous, the policy should be construed to include stepchildren.

Nor did the stepchild relationship necessarily end upon Evans' divorce from Gerald's biological mother. The dissolution of a marriage does not terminate affinity relationships in cases involving inheritance tax,

insurance benefits, and worker's compensation issues. *In re Bordeaux' Estate,* 37 Wash.2d 561, 594, 225 P.2d 433, 440 (1950). After a comprehensive analysis, *Bordeaux* held that based on affinity, children of a deceased spouse were stepchildren of the surviving spouse for inheritance tax purposes, even though there was no surviving issue of the marriage. *Bordeaux* is the leading authority on the issue of affinity relationships, and accurately states the view followed in a majority of jurisdictions. *See Petition of the United States,* 418 F.2d 264, 270–71 (1st Cir.1969); Mahoney, *Support and Custody Aspects of the Stepparent–Child Relationship,* 70 Cornell L.Rev. 38, 57 (1984). *But see Brotherhood of Locomotive Firemen & Enginemen v. Hogan,* 5 F.Supp. 598, 605 (D.Minn.1934) (only when issue survives the dissolution of the marriage does affinity relationship continue between the stepparent and the other children of the former spouse).

Evans pled sufficient facts which, if true, could support a finding that the affinity relationship with Gerald continued under both the majority and the minority views. Under both views, the maintenance of strong filial ties and contact after divorce is crucial in determining the continued existence of affinity relationships. The complaint alleges that Gerald regularly spent several nights a week with Evans; Gerald used "Evans" as his last name; and Evans regularly contributed to Gerald's financial support. Although his complaint is ambiguous, Evans specifically alleges in his briefs that he and Gerald's biological mother have surviving issue of their marriage.

I therefore respectfully dissent from Part III of the opinion affirming the dismissal of Evans' complaint.