[No. G012384. Fourth Dist., Div. Three. May 27, 1993.]

INTER VALLEY HEALTH PLAN, Plaintiff and Appellant, v.
BLUE CROSS/BLUE SHIELD OF CONNECTICUT, Defendant and
Respondent.

62

**COUNSEL**

Stradling, Yocca, Carlson & Rauth and Julie McCoy Akins for Plaintiff and Appellant.

Galton & Helm and Michael F. Bell for Defendant and Respondent.

**OPINION**

**SILLS, P. J.**—The cost of Anjanette Farace's bone marrow transplant and chemotherapy exceeded half a million dollars. Fortunately, she was covered by the health plans provided by each of her divorced parents' respective employers.

In fact, both plans—to their credit—paid for the treatment, leaving Children's Hospital of Orange County overpaid by some $511,000. The hospital deposited this money into the registry of the Orange County Superior Court, and the mother's plan, Inter Valley Health Plan, sued the father's plan, an employee medical plan administered by Blue Cross/Blue Shield of Connecticut (Blue Cross), to determine which plan was primarily responsible.

After a trial on stipulated facts and declarations submitted with the trial briefs, the court determined that the matter was governed by the federal

employee benefits law known as ERISA,[1] and, under ERISA, as interpreted by *PM Group Life Ins.* v. *Western Growers Assur. Trust* (9th Cir. 1992) 953 F.2d 543 (*PM Group Life*), the mother's plan was primary because her birthday comes earlier in the calendar year than the father's birthday (the birthday rule).

We reverse. *PM Group Life* did not involve divorced parents, and the distinction between a married couple and a divorced one is important in this context: a married couple is ordinarily one economic unit, a divorced couple is two. While we conclude this case is governed by ERISA, we also conclude that because ERISA does not have a coordination of benefits provision the appropriate rule under ERISA is to defer to the law of the forum state—here, California. And, under California law as it applies to divorced parents in the light of Anjanette's parents' divorce decree, it is her father's plan that is primarily responsible for her health care expenses.

I

We first tackle the question of whether this case is governed directly by ERISA or by state law. The preemption language in ERISA has been well explored in a series of federal decisions (e.g., *FMC Corp.* v. *Holliday* (1990) 498 U.S. 52 [112 L.Ed.2d 356, 111 S.Ct. 403]; *Metropolitan Life Ins. Co.* v. *Mass.* (1985) 471 U.S. 724 [85 L.Ed.2d 728, 105 S.Ct. 2380]). The language is structured in three parts. First there is a broad preemption clause, preempting state laws which "relate to any employee benefit plan."[2] Then there is a "saving clause" which excludes any state law which "regulates insurance" from the scope of the preemption clause.[3] Finally, there is a "deemer" clause which, as a practical matter, carves out an exception to the saving clause by

---

[1]ERISA stands for the Employee Retirement Income Security Act of 1974. It has had a dramatic impact on employer-provided health plans. (See *Pilot Life Ins. Co.* v. *Dedeaux* (1987) 481 U.S. 41 [95 L.Ed.2d 39, 107 S.Ct. 1549] [preemption of state common law causes of action].)

[2]"Except as provided in subsection (b) of this section, the provisions of this subchapter . . . shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan. . . ." (29 U.S.C. § 1144(a).)

This preemption clause has been described as "one of the broadest preemption clauses ever enacted by Congress." (*Evans* v. *Safeco Life Ins. Co.* (9th Cir. 1990) 916 F.2d 1437, 1439.)

[3]"Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." (29 U.S.C. § 1144(b)(2)(A).)

providing that employee benefit plans shall not be "deemed" insurance companies for purposes of the saving clause.[4]

Accordingly, preemption under ERISA is tested under a three-step analysis: First, does the state law relate to an employee benefit plan? Second, does the state law regulate insurance? Third, may the plan be deemed an insurer under the state law? (See *Moore* v. *Provident Life & Acc. Ins. Co.* (9th Cir. 1986) 786 F.2d 922, 926.)

The California coordination of benefits regulations undoubtedly both "relate to" the employee benefit plans in this case and "regulate insurance." (See *Shaw* v. *Delta Air Lines Inc.* (1983) 463 U.S. 85, 96-97 [77 L.Ed.2d 490, 500-501, 103 S.Ct. 2890] [giving broad meaning to "relate to"]; *PM Group Life, supra*, 953 F.2d at p. 546 ["Our only remaining question is whether California's coordination of benefits provision is a state insurance regulation. No doubt it is."].) The key issue is whether the father's plan is deemed an "insurance company."

For better or worse, the test laid down by the United States Supreme Court on the application of the deemer clause is whether the particular plan in question is self-funded. (*FMC Corp., supra*, 498 U.S. at pp. 58-63 [112 L.Ed.2d at pp. 365-367, 111 S.Ct at p. 409].) If so, the plan is governed by ERISA. On the other hand—and here is where it gets a little tricky—"employee benefit plans that are insured are subject to indirect state insurance regulation." (*Ibid.*) By "indirect regulation," the Supreme Court reveals that a state may regulate any insurer that issues a policy purchased by a plan: "Our interpretation of the deemer clause makes clear that if a plan is insured, a State may regulate it indirectly through regulation of its insurer and its insurer's insurance contracts; if the plan is uninsured, the State may not regulate it." (498 U.S. at pp. 63-66 [112 L.Ed.2d at pp. 368-369, 111

---

[4] "Neither an employee benefit plan . . . nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies." (29 U.S.C. § 1144(b)(2)(B).)

ERISA's convoluted structure on the preemption issue is not unlike that of an insurance policy. The preemption clause is analogous to an insuring clause, the saving clause to an exclusion, and the deemer clause plays the role of an exception to an exclusion. (But see *FMC Corp., supra*, 498 U.S. at pp. 63-66 [112 L.Ed.2d at pp. 368-369, 111 S.Ct at p. 411] ["We view the language of the deemer clause, however, to be either coextensive with or broader, not narrower, than that of the saving clause."].) For our purposes we need not press the comparison to determine whether the preemption clause should be, like insuring clauses generally, construed "broadly" while the saving clause, like exclusions, should be construed "narrowly."

S.Ct at p. 411].)[5] The Supreme Court did not go so far as to say that a state may directly regulate any plan that buys insurance for itself.

In the instant case, the father's plan is self-funded, but purchases aggregate stop-loss insurance.[6] The parties have stipulated that under the stop-loss arrangement the insurer reimburses the father's plan "for the amount by which total paid claims for all participants in the plan exceed certain specified limits."

The Ninth Circuit has already dealt with the question of whether ERISA governs employee benefit plans which, while self-funded, purchase stop-loss insurance policies. It does. (*United Food & Commercial Workers* v. *Pacyga* (9th Cir. 1986) 801 F.2d 1157, 1161-1162; *Moore* v. *Provident Life & Acc. Ins. Co., supra,* 786 F.2d at pp. 926-927.) While Inter Valley cites us contrary authority from the Sixth Circuit (*Northern Group Services* v. *Auto Owners Ins. Co.* (6th Cir. 1987) 833 F.2d 85, 91; *Michigan United Food and Commercial* v. *Baerwaldt* (6th Cir. 1985) 767 F.2d 308, 312-313), we believe *Pacyga* and *Moore* to be the better reasoned cases.

The Supreme Court did not set up a simple self-funded-equals-preempted, insured-equals-nonpreempted dichotomy. State regulation reaches insured plans only "indirectly," as the regulation affects the insurance which the plans purchase. In this context, a state regulation making the plan itself—as distinct from a third party who insures it—primary over another plan would *directly* regulate the plan. The relationship between a health plan and its own insurer is not the same as that between a plan and another plan. Both *Pacyga* and *Moore* recognize the elementary fact that stop-loss insurers do not pay benefits directly to participants of the plan, but to the plan itself. (See *Pacyga, supra,* 801 F.2d at pp. 1161-1162; *Moore, supra,* 786 F.2d at pp. 926-927.)

II

However, it is one thing to determine that ERISA governs, another to figure out what ERISA would have us do. As *PM Group Life* notes, "ERISA does not include a coordination of benefits provision" to resolve primary-excess conflicts between parents' health plans. (953 F.2d at p. 546.)

---

[5]Justice Stevens thinks the insured-uninsured distinction makes no sense. (See *FMC Corp., supra,* 498 U.S. at pp. 63-68 [112 L.Ed.2d at pp. 368-370, 111 S.Ct at pp. 411-412] (dis. opn. of Stevens, J.) [distinction described as "illogical," "irrational" (twice) and "anomalous"]).

[6]Anjanette's father was covered by a plan established in 1985 for employees of St. Francis Hospital and Medical Center, administered by Blue Cross. In addition, the stop-loss insurance was purchased under an agreement with Blue Cross.

At the outset, we must reject the notion that because *PM Group Life* used the birthday rule, we must apply it in the circumstances of this case. In adopting the birthday rule, *PM Group Life* first rejected the idea of adopting the law of the forum state. Reasoning from the broad preemption provision in ERISA, the *PM Group Life* court focused primarily on the need to adopt a *uniform* federal rule under ERISA, and secondarily on the textual obscurity of the applicable California insurance regulations. (See 953 F.2d at pp. 546-547.)

These considerations are not persuasive here. First, federal law is not uniform, and is not going to be uniform until the United States Supreme Court finally decides the matter. *PM Group Life* does not appear to have been aware of cases from the Sixth and Seventh Circuits which adopted an approach altogether different from the birthday rule. (See *Auto Club Ins.* v. *Health and Welfare Plans* (6th Cir. 1992) 961 F.2d 588, 594-595; *Winstead* v. *Indiana Ins. Co.* (7th Cir. 1988) 855 F.2d 430, 433-434.)[7] These cases first try to reconcile the coordination of benefit provisions in the respective plans, and then, if those provisions are mutually exclusive, apportion responsibility pro rata. Because this approach amounts, as it were, to dividing the baby in half, it has been termed "solomonic." (See *Winstead, supra,* 855 F.2d at p. 434.)

Second, however convoluted and self-contradictory the California regulations concerning the children of *non*divorced parents may be, the regulations are reasonably straightforward where the children of divorced parents are concerned.[8] Parallel provisions in title 10, California Code of Regulations, sections 1300.67.13, subdivision (b)(4)(C) through (E) and 2232.56, subdivision (d)(3) through (5) set out the "order of benefit determination" of overlapping health benefit plans.

The basic rule is that plan responsibility follows custody. Where the parents are divorced and the parent with custody has not remarried, title 10, California Code of Regulations, sections 1300.67.13, subdivision (b)(4)(C)

---

[7]On pages 547 to 548 of the opinion, the *PM Group Life* court mentions a district court case from Michigan as the "one other court that has addressed the issue."

Interestingly enough, the trial judge in the present case also noted the omission of any mention of *Winstead* in the *PM Group Life* decision.

[8]When *PM Group Life* quoted title 10, California Code of Regulations, section 2232.56, subdivision (d)(2) to show that California is trying (though perhaps not too clearly) to adopt the birthday rule, the court omitted the introductory words, "Except for cases of a person for whom claim is made as a dependent child whose parents are separated or divorced . . . ." (See 953 F.2d at p. 546, fn. 4.)

and 2232.56, subdivision (d)(3) make primary the plan of the parent with "custody."[9] Where the parents are divorced and the parent with custody *has* remarried, sections 1300.67.13, subdivision (b)(4)(D) and 2232.56, subdivision (d)(4) make primary first the plan of the parent with custody, next the plan of the stepparent, and then finally the plan of the parent without custody.[10] Finally, sections 1300.67.13, subdivision (b)(4)(E) and 2232.56, subdivision (d)(5) allow the previous two rules to be overridden where "there is a court decree which would otherwise establish financial responsibility for the medical, dental or other health care expenses with respect to the child." In such a case, the primary plan is the one "of the parent with such financial responsibility."[11] These regulations do not have the self-contradictory element that discouraged the court in *PM Group Life* from following the law of the forum state. (See 953 F.2d at p. 547, fn. 4 ["So construed, section 2232.56, subdivision (d)(2) contradicts itself by giving preference to plans that fail to follow it."].)

The basic order set out in the California regulations follows the sequence recommended by the Advisory Committee to the National Association of Insurance Commissioners (NAIC), whose 1985 report has been included in the record. That is, if the parents are not divorced or separated, the birthday rule should be used. If the parents are divorced or separated, the order of health insurers is first that of the parent with custody, then the spouse of the parent with custody, then the noncustodial parent, except where "the specific terms of a court decree state that one of the parents is responsible for the

---

[9]The text of title 10, California Code of Regulations, section 1300.67.13, subdivision (b)(4)(C) and section 2232.56, subdivision (d)(3) is: "In the case of a person for whom claim is made as a dependent child whose parents are separated or divorced and the parent with custody of the child has not remarried, the benefits of a Plan which covers the child as a dependent of the parent with custody of the child will be determined before the benefits of a plan which covers the child as a dependent of the parent without custody."

[10]The text of title 10, California Code of Regulations, section 1300.67.13, subdivision (b)(4)(D) and section 2232.56, subdivision (d)(4) is: "In the case of a person for whom claim is made as a dependent child whose parents are divorced and the parent with custody of the child has remarried, the benefits of a Plan which covers the child as a dependent of the parent with custody shall be determined before the benefits of a Plan which covers that child as a dependent of the stepparent, and the benefits of a Plan which covers that child as a dependent of the stepparent will be determined before the benefits of a Plan which covers that child as a dependent of the parent without custody."

[11]The text of title 10, California Code of Regulations, section 1300.67.13, subdivision (b)(4)(E) is: "In the case of a person for whom claim is made as a dependent child whose parents are separated or divorced, where there is a court decree which would otherwise establish financial responsibility for the medical, dental or other health care expenses with respect to the child, then, notwithstanding rules C. and D., the benefits of a Plan which covers the child as a dependent of the parent with such financial responsibility shall be determined before the benefits of any other Plan which covers the child as a dependent child." Section 2232.56, subdivision (d)(5) is the same, except it substitutes the words "paragraphs (3) and (4) above" for "rules C. and D."

child's health care expenses and the insurer or other entity obliged to pay or provide the benefits of that parent's plan has actual knowledge of those terms." In such an event that plan pays first. The basic difference between the California regulations and the NAIC approach is that in cases where the parents are not divorced or separated, the California regulations add an unnecessarily mysterious sentence which arguably appears to allow a plan to depart from the birthday rule.[12] In any event, because the instant case is one where the parents were divorced, the reason which prompted the Ninth Circuit to depart from the California regulations is not present here.

This last point bears elaboration. *PM Group Life* did not deal with the child of divorced parents. The difference is substantively important. Absent agreement to the contrary, California law treats married couples as part of an ongoing economic partnership. (E.g., *In re Marriage of Worth* (1987) 195 Cal.App.3d 768, 773 [241 Cal.Rptr. 135]; *Johns* v. *Retirement Fund Trust* (1981) 117 Cal.App.3d 113, 116 [172 Cal.Rptr. 541]; *In re Marriage of Brigden* (1978) 80 Cal.App.3d 380, 389 [145 Cal.Rptr. 716].) In essence, a married couple is a single economic unit. Accordingly, there is a reason to draw an arbitrary line as to which health insurer has primary responsibility as between a married couple. The birthday rule, in such a context, is the analytic equivalent of flipping a coin.

This is obviously not the case with a divorced couple, who are two economic units. And, given the economic independence of a divorced couple, it makes far more sense for primary responsibility to follow the relationship which the parties themselves structure into their divorce judgment.

Accordingly, we do not believe that *PM Group Life*'s birthday rule controls this case. The question remains, however—what is the appropriate rule under ERISA?

As mentioned, while the preemption provisions of ERISA are broad, there is no provision directly on point. In light of our discussion above, and the fact, recognized by *PM Group Life*, that "[f]ederal courts often rely on state law to fill the gaps Congress leaves in federal statutes" (953 F.2d at p. 546), the gap should be supplied by the state regulations, particularly where, as here, those regulations follow the national pattern.

---

[12]Here is the sentence, quoted from *PM Group Life,* 953 F.2d at page 547, footnote 4: "If either plan does not have the provisions of this paragraph regarding dependents, which results either in each Plan determining its benefits before the other or in each Plan determining its benefits after the other, the provisions of this paragraph shall not apply, and the rule set forth in the Plan which does not have the provisions of this paragraph shall determine the order of benefits." We will not attempt an English translation.

The first question that arises in applying the state regulations pertaining to cases where the parents are divorced is the word "custody." Anjanette's mother and father were each given joint "legal" custody of her, but her mother has had sole "physical" custody.

■ In determining the intent of lawmakers, courts look first to the words of the provision, giving those words their "usual and ordinary meaning." (Cf. *People* v. *Hull* (1991) 1 Cal.4th 266, 271, 274-275 [2 Cal.Rptr.2d 526, 820 P.2d 1036]; *City of Santa Cruz* v. *Municipal Court* (1989) 49 Cal.3d 74, 90 [260 Cal.Rptr. 520, 776 P.2d 222].) The principle also applies to regulators. "Administrative regulations are subject to the same rules of construction and interpretation that apply to statutes." (*Organization of Deputy Sheriffs* v. *County of San Mateo* (1975) 48 Cal.App.3d 331, 341 [122 Cal.Rptr. 210].)[13]

■ While custody can have a specialized meaning under the Family Law Act (see Civ. Code, § 4600.5, subd. (d)(5)),[14] it is not the ordinary meaning of the word. The ordinary meaning of "custody" in the context of a child of divorced parents is *physical* custody—the parent with whom the child actually lives. Accordingly, we conclude that under California law, the Code of Regulations makes the mother's plan primary *unless* "there is a court decree which would otherwise establish financial responsibility for the medical, dental or other health care expenses with respect to the child." (See Cal. Code Regs., tit. 10, §§ 1300.67.13, subd. (b)(4)(E) and 2232.56, subd. (d)(5).)[15]

This brings us to the divorce judgment between Anjanette's parents, filed in April 1983 in Los Angeles Superior Court. The document provides that her father "shall maintain all of the parties' children as beneficiaries of any health and dental care insurance policies he may now have or may be able to obtain through his employment . . . ." It also provides that each party shall pay half the cost of orthodontic care, and half the cost of existing and future accounts with a certain dental group in West Covina or "such other dental bills as the children may incur." The judgment does not directly address the question of who is responsible for medical and health care expenses (other than dental expenses) not otherwise covered by health insurance.

[13]We are not aware of any specialized meaning of "custody" given the word by the administrative agency involved with the implementation of the statute.

[14]The statute reads: " 'Joint legal custody' means that both parents shall share the right and the responsibility to make the decisions relating to the health, education, and welfare of a child."

[15]The California insurance regulations do not address the case of actual joint physical custody, i.e., where a child spends equal time with each parent. Joint physical custody is not present in the case before us, and, accordingly, we do not address the question of which plan—or plans—would be primary if it were.

And so this case boils down to one question: does the court decree obligating Anjanette's father to maintain her as a beneficiary on any health plans he then had or "may be able to obtain through his employment" constitute "a court decree which would otherwise establish financial responsibility for the medical, dental or other health care expenses with respect to the child?"

We recognize there is nothing in the judgment of dissolution which assigns to Anjanette's father the responsibility to pay all her medical expenses when they are not otherwise covered by health insurance. Indeed, in the absence of health insurance, both parents would bear responsibility. (Civ. Code, § 4720, subd. (a)(3)(B) and (D); see also *Carr* v. *Marshman* (1983) 147 Cal.App.3d 1117, 1121 [195 Cal.Rptr. 603] ["a decree of dissolution which requires one parent alone to support the children does not abrogate the duty of the other parent to support those children"]; Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 1993) ¶ 6:2 ["Each parent has an 'equal responsibility' to support their minor children 'in the manner suitable to the child's circumstances . . . .' "].)[16] If, for some reason, Anjanette's father found himself in a job which did *not* offer "any" health insurance at all, he could hardly be held in contempt for failing to "maintain" Anjanette on that nonexistent insurance.

However, it is precisely the imposition on both parents of responsibility for uncovered health expenses that shows the parties contemplated that "financial responsibility" for Anjanette's medical expenses would rest with her father's health plan—at least as long as he had the opportunity for a health plan "through employment." The parents could not have diminished their own collective responsibility toward Anjanette by means of an agreement, but they could try to make sure that one of them would take the necessary steps to have an insurer assume financial responsibility for Anjanette's health care costs. The provision in the judgment requiring Anjanette's father to maintain his present health insurance and obtain health insurance if offered "through employment" was as much as they could do, as between themselves, to "establish" financial responsibility with the father's insurer.

Significantly, the judgment of dissolution puts no limits on Anjanette's father's obligation to "maintain" her on his then-present health insurance, or on "any" insurance that might be available "through employment" in the future. If his then-present or future employer required, say, a large employee contribution to "maintain" the children as dependents on the plan, Anjanette's father would have had to pay it under the terms of the judgment. In

---

[16]We do not address the nature of the responsibility as between the two parents, e.g., whether it is equal, or based on principles of joint and several liability or some other standard.

fact, the words "any," "through employment" and "able to obtain" show that even if an employer simply made a health plan available "through employment" with *no* employer contribution, Anjanette's father would have been obligated to sign up for it and pay any payroll deduction required. Thus, the requirement that Anjanette's father "maintain" then-present health insurance envisioned at least some *substantive* obligation on his part to obtain health insurance, and was not solely a matter of guaranteeing the continued existence of what might simply be a *gratuitously* provided benefit. Construing the dissolution decree in this case, we must conclude that the parents structured it so that the father's health plan (if one was available through employment) would assume financial responsibility for Anjanette's health care expenses.

### III

Under ERISA, as incorporating the law of the forum state, the father's plan, and not the mother's plan, is the primary one. We must therefore reverse the judgment of the trial court, and direct that a new one be entered declaring the father's plan, Blue Cross, as the primary insurer for the services provided to Anjanette by Children's Hospital of Orange County, and that the funds deposited shall be paid to Inter Valley. In the interests of justice both parties will bear their own costs on appeal.

Moore, J., and Sonenshine, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 19, 1993.