**Kevin Thomas QUINN, Plaintiff,**

v.

**The PAUL REVERE LIFE INSURANCE COMPANY, Defendant.**

**Civil No. 95–1530–HA.**

United States District Court, D. Oregon.

Sept. 25, 1996.

Charles Paulson, Paulson & Baisch, Portland, OR, for Plaintiff.

Lori R. Metz, Chrys A. Martin, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, OR, for Defendant.

## OPINION AND ORDER

HAGGERTY, District Judge:

Plaintiff Kevin Thomas Quinn ("Quinn") originally brought this action in the Circuit Court of the State of Oregon for the County of Multnomah, alleging that defendant Paul Revere Life Insurance Company ("Paul Revere") had violated the parties' insurance agreement by denying his claim for disability benefits. Because the parties' agreement was governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, Paul Revere subsequently removed the action to this court based on federal question jurisdiction under 28 U.S.C. § 1331. Following removal, Quinn amended his complaint to state a claim under ERISA.

Before this court is Paul Revere's motion for summary judgment. For the reasons below, I grant the motion.

## BACKGROUND

The following factual background is based on the administrative record ("Record") attached as Exhibit A to the Affidavit of Paul Keenan. Quinn is a cardiac surgeon who was licensed to practice medicine in Oregon on June 19, 1989. Because Quinn had previously been treated for chemical dependency, his Oregon medical license was issued on the condition that he become involved in probation with the Board of Medical Examiners ("BME"). The BME supervised Quinn's ongoing recovery until June of 1993. At that time, Quinn was advised that he could terminate his probation with the BME if he signed an agreement with the Oregon Diversion Program for Health Professionals ("diversion program"). Plaintiff signed a voluntary agreement to participate in the diversion program, thereby terminating his probation with the BME.

The diversion program was established in 1989 by the Oregon Legislature to enable chemically addicted health care practitioners to get needed assistance without risking disciplinary action by the BME. *See* ORS 677.645. The diversion program gets practitioners into treatment and then monitors them during recovery. A BME report issued shortly after the inception of the diversion program described the program as follows:

The program will consist of a five-member supervisory council and a medical director to administer the program.... These physicians—all with either a personal or professional interest in the disease of addiction—will identify and get treatment for practitioners, and then closely monitor them through recovery.

\*    \*    \*    \*    \*    \*

If a practitioner voluntarily enters into the diversion program and abides by the conditions set out by the council, the medical board won't be able to take disciplinary action.

\*    \*    \*    \*    \*    \*

The strength of the diversion program is it aims to intervene **before** the problem comes to the board's attention.

Record, p. 235 (emphasis in original).

Dr. Gary D. Olbrich, who is the medical director of the diversion program, has described the program as follows:

Our function is to help intervene on affected individuals, advise them where to get adequate treatment and then to monitor their abstinence and recovery progress **after completion of treatment.** The program at no time is an instrument of treatment itself. We act as a resource for chemically dependent physicians, facilitate their access of treatment needs and in the monitoring process provide them with doc-

umentation of abstinence and progress in addressing life issues.

*Id.* at 233.

With respect to Quinn's participation in the diversion program, Dr. Olbrich stated:

At the time Dr. Quinn was invited to be involved in our program in 1993, he had been adequately treated for his chemical dependency ... and was asking to enter our program to obtain ... ongoing professional advocacy.

*Id.*

Quinn's participation in the diversion program involved random urinalysis testing, quarterly visits with a monitoring consultant, and an annual visit with Dr. Olbrich.

In 1992, Quinn began working for the Starr–Wood Cardiac Group ("Starr–Wood") in Portland, Oregon. Plaintiff participated in a group long-term disability plan (the "Plan") that Starr–Wood provided for its employees pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* The Paul Revere Life Insurance Company, which issued the insurance policy covering Starr–Wood employees, is also the claims administrator for the Plan. The effective date of the Plan was April 1, 1994.

In September 1994, plaintiff suffered a relapse of his chemical dependency and ceased going to work. Shortly thereafter, plaintiff was hospitalized and diagnosed as suffering from chemical dependency and acute narcissistic personality disorder. *Id.* at 53.

On February 9, 1995, plaintiff submitted a claim for disability benefits, identifying his last day of work as September 16, 1994 and listing his sickness as "chemical dependency." Paul Revere denied plaintiff's claim under the Plan's pre-existing condition limitation. That provision of the Plan reads:

**PRE–EXISTING CONDITIONS LIMITATION**

Any period of disability due to pre-existing condition is not covered.

**PRE–EXISTING CONDITION** means a condition which:

1.  is caused by an injury or sickness; and

2.  requires an employee, during the six months just before becoming insured, to:

    a.  consult a doctor

    b.  seek diagnosis or advice or receive medical care or treatment; or

    c.  undergo hospital admission or doctor's visits for testing or for diagnostic studies; or

    d.  obtain service, supplies, prescription drugs or medicines.

This limitation does not apply to disabilities which begin after the employee has met either one of the conditions shown below, whichever occurs first:

1.  The employee works full-time while insured by the Policy, and is not absent from work due to the pre-existing condition for at least 12 consecutive months.

2.  The employee remains insured for twenty-four consecutive months.

The Plan, Sec. 4.

Given the April 1, 1994 effective date of the Plan and the September 16, 1994 commencement date of plaintiff's claimed disability, it is undisputed that plaintiff met neither of the conditions precluding application of the limitation. Accordingly, Paul Revere was obligated to consider whether plaintiff's condition was "pre-existing" under the Plan's definition of that term.

On June 16, 1995, Paul Revere Claim Examiner Linda Downing sent notice to Starr–Wood that plaintiff's claim for disability benefits was being denied. Downing stated that "[b]ased on the medical information contained in [plaintiff's] file, he was treated for his condition during the pre-existing period of October 1, 1993 to April 1, 1994." The claim examiner informed Starr–Wood of plaintiff's right to appeal.

In a letter dated June 26, 1995, plaintiff informed the claim examiner that he was surprised by the adverse decision, because he received no treatment or counseling in the six months immediately prior to the effective date of the policy, but instead had received only random urine monitoring. Paul Revere accepted this letter as notice of appeal.

On appeal, plaintiff augmented the administrative record by having Dr. Olbrich submit

a letter and supporting materials, which described the diversion program and plaintiff's participation in the program. On September 11, 1995, plaintiff's appeal was denied and Paul Revere's decision to deny benefits became final. According to the claim examiner, it continued to be Paul Revere's position that plaintiff had received treatment while participating in the diversion program. Specifically, the claim examiner stated that "the ongoing monitoring of your recovery through services such as testing, indeed constitutes a phase of treatment." The examiner further stated that "more importantly, your receipt of treatment as you and Dr. Olbrich have defined it is not the only condition precedent to a pre-existing condition classification." Plaintiff sued Paul Revere in state court for breach of the insurance contract, and the insurance company removed the action to this jurisdiction. Paul Revere now moves for summary judgment.

### LEGAL STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The materiality of a fact is determined by the substantive law on the issue. *T.W. Elec. Serv., Inc. v. Pacific Electrical Contractors Asso.*, 809 F.2d 626, 630 (9th Cir.1987). The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *T.W. Electrical*, 809 F.2d at 630.

### DISCUSSION

There are three issues before the court arising from defendant's summary judgment motion: (1) what standard should this court apply in reviewing Paul Revere's decision to deny benefits; (2) should the court confine its review to the administrative record (i.e. the record before Paul Revere at the time it rendered its decision to deny benefits), or should the court allow plaintiff to submit additional materials; and (3) did Paul Revere properly conclude that the Plan's pre-existing condition limitation barred plaintiff's recovery of disability benefits.

#### A.  *Standard of Review*

The beneficiary of an ERISA plan may bring an action against a claim administrator to recover benefits "due to him under the terms of this plan." 29 U.S.C. § 1132(a)(1)(B). The standard of review of an administrator's decision is *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). If the administrator or fiduciary has discretionary authority, its decision is reviewed for abuse of discretion. *Id.* at 114–15, 109 S.Ct. at 956–57; *see also Dytrt v. Mountain State Tel. & Tel. Co.*, 921 F.2d 889, 894 (9th Cir. 1990).

The parties disagree on what standard of review is appropriate in this case. Paul Revere asserts that the abuse of discretion standard should apply because the plain language of the Plan grants it discretion to interpret the terms of the Plan and to make determinations on claims for benefits. The relevant policy provision reads:

The Paul Revere Life Insurance Company, as the Claims Administrator, has the full, final, conclusive and binding power to construe and interpret the policy under the plan as may be necessary in order to make claims determinations. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious or unless there is no rational basis for a decision.

The Ninth Circuit has interpreted similar language in long-term disability plans as sufficient to trigger the more deferential standard of review. *See, e.g. Jones v. Laborers Health & Welfare Trust Fund,* 906 F.2d 480, 481 (9th Cir.1990) (administrator had discretion where plan gave it "power ... to construe the provisions of this Trust Agreement and the Plan, and any such construction adopted by the Board in good faith shall be binding").

Plaintiff contends that a *de novo* standard is appropriate because the Plan does not actually give Paul Revere exclusive or final authority to construe uncertain terms or make eligibility determinations. Plaintiff points to an arbitration clause in the Plan, which reads:

> If a dispute arises over long term disability income benefits payable, the employee or [Paul Revere] has the right to submit the dispute to an arbitration committee.
>
> The arbitration committee shall consist of one person selected by the employee, one person selected by [Paul Revere], and one person selected by the other two. The decision the committee reaches must be a majority. The decision will not void the employee's right to legal action.

Plan, Section 2.

■ If the clause were construed as proposed by plaintiff, the clause would be inconsistent with the provision stating that the claim administrator has "full, final, conclusive and binding power to construe and interpret the policy." A more logical construction of the arbitration clause is that it merely establishes the right of a claimant to pursue arbitration in lieu of filing a court action. This interpretation is bolstered by the express language that the decision of the arbitration committee "will not void the employee's right

to legal action." Indeed, had plaintiff elected to arbitrate, then the arbitration committee, like this court, would have been limited to reviewing for abuse of discretion. The court notes that Paul Revere is both the insurance company and the claim administrator. This presents a formal conflict of interest. "If that conflict [leads] to a true conflict the standard of review would not change but scrutiny of [Paul Revere's] decision would become more searching." *Snow v. Standard Ins. Co.,* 87 F.3d 327, 331 (9th Cir.1996). The court, however, finds no evidence in the record to support a true conflict. In light of the arguments presented and the authorities provided, this court concludes that it is compelled to apply the more deferential standard of review.

**B. *Scope of Review***

■ The question as to the proper scope of review is answered by the court's ruling on the proper standard of review. Since the court determined that an abuse of discretion standard applies, then its review is limited to the evidence before the claim administrator. *Snow,* 87 F.3d at 332. Accordingly, plaintiff's request for leave to take discovery is denied.

**C. *Did Paul Revere's Decision to Deny Benefits Constitute an Abuse of Discretion***

■ Under the abuse of discretion standard, the denial of benefits must be upheld unless the decision was arbitrary and capricious. *Barnett v. Kaiser Found. Health Plan,* 32 F.3d 413, 416 (9th Cir.1994). The "touchstone of 'arbitrary and capricious' conduct is unreasonableness." *Id.* An ERISA plan administrator may abuse its discretion by: (1) making a decision without an explanation; (2) construing provisions of the plan in a manner that conflicts with the plain language of the plan; or (3) relying upon clearly erroneous findings of fact in making benefit determinations. *Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317, 1323–24 (9th Cir.1995). A decision that is "so patently arbitrary and unreasonable as to lack foundation in factual basis" reflects an abuse of

discretion. *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472 (9th Cir.1994) (citation omitted).

■■■ The mere existence of evidence in the record supporting a conclusion different than that reached by the plan administrator does not require the conclusion that a plan administrator has abused its discretion. *See, e.g., Eley v. Boeing Co.*, 945 F.2d 276, 279 (9th Cir.1991). Likewise, a plan administrator may reach conclusions contrary to those reached in other proceedings, such as the determination of a social security claim, without abusing its discretion. *See, e.g., Taft*, at 1473; *Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279, 1285 (9th Cir.1990), *cert. denied*, 498 U.S. 1087, 111 S.Ct. 964, 112 L.Ed.2d 1051 (1991); *Anderson v. Operative Plasterers and Cement Masons Int'l Ass'n*, 991 F.2d 356, 358–59 (7th Cir.1993).

The Ninth Circuit addressed interpreting a pre-existing condition limitation in an ERISA plan in *Eley*. In that case, the plaintiff was covered by a group plan administered by King County Blue Shield. Shortly before she became covered under the plan, Eley had a Pap test which indicated that she might have cervical cancer. Shortly after coverage began, Eley had a biopsy which showed cancer. She thereafter had a hysterectomy and submitted a claim for reimbursement.

Blue Shield denied Eley's claim because it determined that the cancer was a pre-existing illness for which she had received a diagnostic test during the 3–month period immediately before her coverage became effective. Under the plan in *Eley*, a pre-existing condition was defined as:

> Any illness ... whether or not diagnosed, for which a person has received medical treatment, consultation, a diagnostic test or prescribed medicines during the three-month period before his or her coverage becomes effective.

*Id.* at 279. On administrative appeal, Blue Shield reviewed the issue with its in-house medical staff and affirmed its decision. Eley then appealed to Boeing's welfare benefit plans committee, the ultimate plan administrator, and submitted declarations of two physicians who stated that the Pap test was not a diagnostic test. Blue Shield, in turn, submitted the opinions of its medical staff that the Pap test was a diagnostic test. The Boeing committee concluded that Blue Shield had used proper procedures in reviewing Eley's claim, and that it had properly interpreted the pre-existing condition provision.

The district court granted summary judgment against Eley, and the Ninth Circuit affirmed. The Ninth Circuit determined that because Boeing had explained its decision, in order for Eley to defeat summary judgment, she was required to show that a genuine issue of material fact existed as to whether Boeing's interpretation of the term "diagnostic test" clearly conflicted with the plain language of the plan. The Court concluded that Eley failed to meet her burden. The Court found that a screening test, like the Pap test, was within the definition of "diagnostic test" because while such tests principally indicate the absence of disease, they also "recognize ... the possible presence of disease." *Id.*

■■■ Paul Revere argues that the instant case is analogous to *Eley*. Paul Revere relied upon the advice of its medical staff concerning whether the monitoring and testing of plaintiff for past chemical dependency pursuant to the diversion program fit within the Plan's definition of pre-existing condition. After the initial denial of plaintiff's claim for benefits, Paul Revere sought the opinion of its consulting psychologist, David J. McDowell, Ph.D. In rendering his opinion, Dr. McDowell initially acknowledged Dr. Olbrich's opinions that plaintiff received no treatment as part of his participation in the diversion program, that plaintiff "had been adequately treated for his chemical dependency" and that the disease was in remission throughout the relevant time period (October 1993 to April 1994). Dr. McDowell, however, explicitly concluded the following as to the diversion program and plaintiff's participation therein:

> I believe such a carefully crafted program, under the direction of a "Medical Director" who is a physician, and who performs "evaluations" of a disease (chemical dependency) "in remission," is unambiguously *a phase of treatment*. While I would agree with Dr. Olbrich that an active phase of

treatment had been closed (I presume largely because the disease being treated was judged to be in remission), the monitoring function is nonetheless a less active and intrusive phase of treatment aimed at early detection of relapse of the underlying, quiescent, but not absent, illness.

As an analogy to physician disease, if a patient with TB is actively treated with rest and medications, the active infection remits, and the lesions heal, then active treatment is terminated. Nonetheless, regular chest X-rays and blood tests are typically required to detect any recurrence of the disease. Such monitoring is a final phase of treatment.

Affidavit of Paul Keenan, Exh. A, pp. 241–42. While Dr. McDowell clearly believed that plaintiff received treatment via his participation in the diversion program, he indicated to Paul Revere that it need not base its decision to deny benefits exclusively on that ground. Dr. McDowell concluded his report by stating:

Contract language states that a condition causing disability is excluded from benefits if, during the six months immediately prior to becoming insured, the insured "obtains services" for the illness. This language is broader than "treatment," and in my view clearly includes the sorts of services provided by Dr. Olbrich and the [diversion program].

*Id.*

It is clear to the court that while participating in the diversion program, plaintiff "obtained services" during the six-month period prior to April 1, 1994, and under the Plan's language that alone is sufficient. The court finds that Paul Revere did not abuse its discretion in determining that plaintiff's claim for benefits was premised upon a pre-existing condition.

Plaintiff contends that "[u]rinalysis is not a . . . screening test for purpose of detecting the possible presence of disease. As a preliminary matter, it can be argued that the urine testing of plaintiff was conducted for the purpose of detecting the possible pres-

ence of disease. Indeed, I can think of no other reason for the testing.

Plaintiff further argues that, at a minimum, the differing, reasonable interpretation of Dr. Olbrich concerning the meaning of "services" renders the Plan fatally ambiguous. However, the mere existence of evidence in the record supporting a conclusion different than that reached by the plan administrator does not require the conclusion that a plan administrator has abused its discretion. Instead, the controlling inquiry here is whether the plan administrator's construction of the pre-existing condition limitation conflicts with the plain language of the Plan. *See Atwood,* 45 F.3d at 1323–24.[1] No evidence suggests that defining plaintiff's testing and monitoring to be "services" conflicts with the language of the Plan.

Plaintiff raises two arguments as to why Paul Revere abused its discretion. First, plaintiff argues that Paul Revere abused its discretion by forsaking its right under the Plan to have plaintiff examined by a physician or vocational expert. The provision of the Plan allowing for such an independent examination, however, is intended to aid in discerning whether a claimant is suffering from a disability. It was not contested that plaintiff suffered from an otherwise compensable illness. Rather, the issue was one of contract interpretation regarding past care, and an independent medical or vocational examination would be of no assistance.

Second, plaintiff argues that Paul Revere abused its discretion by relying solely on the opinion of Dr. McDowell, a psychologist, as opposed to procuring the opinion of a medical doctor. Dr. McDowell, as well as the claim examiner, considered the opinion of Dr. Olbrich. Plaintiff offers no support for the proposition that a physician is any more suited than a psychologist to interpret the pre-existing condition limitation of the Plan. Any possible credence to such a proposition is negated by the fact that the language of a group disability plan is to be interpreted "in an ordinary and popular sense as would a person of average intelligence." *Evans v.*

---

1. There is no dispute that Paul Revere explained its decision. *See Atwood,* 45 F.3d at 1323–24. Nor is it disputed that Paul Revere did not rely upon clearly erroneous findings of fact. *See Id.*

*Safeco Life Ins. Co.,* 916 F.2d 1437 (9th Cir.1990).

As a final argument, plaintiff states that the Plan is ambiguous in that it is not clear whether the pre-existing condition limitation extends to the disease of chemical dependency. This argument is based on the fact that following the pre-existing condition limitation is another section of Plan entitled "Other Limitations," which states, in pertinent part:

> For any disability which is caused or contributed to by a psychiatric disorder, *alcoholism, drug abuse* or the use of any drug other than one administered on a doctor's advice, *benefits are payable* for up to twenty-four months whether or not the employee is hospital confined. After twenty-four months, subject to all other policy provisions, we pay benefits only if an employee continues to be hospital confined due to the disability, and for up to three months after the date the employee is no longer confined.

Plaintiff misconstrues the issue by emphasizing the above language. In proper context, it is evident that insureds who suffer from the diseases noted above are not guaranteed benefit payments and are not exempted from other limitations, including the pre-existing condition limitation. Rather, these insureds are subject to limitations on the duration of benefit payments once they have been deemed eligible (i.e., not excluded under the pre-existing condition limitation).

## CONCLUSION

The evidence before this court establishes the existence of substantial evidence to support Paul Revere's determination that plaintiff fell within the parameters of the Plan's pre-existing condition limitation. Accordingly, Paul Revere's determination that plaintiff was not entitled to benefits under the Plan was reasonable, and Paul Revere did not abuse its discretion in making such a determination. For the foregoing reasons and based upon the authorities provided, defendant's motion for summary judgment (doc. # 13) is GRANTED. All other pending motions are denied. This case is closed.

IT IS SO ORDERED.