95 F.3d 1156
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Florie AYALON; Hudie Ayalon, Plaintiffs/Counter-Defendants
and Appellants/Cross-Appellees,
v.
ATLANTASTAFF, INC. Group Medical and Dental Benefit Program;
AtlantaStaff, Inc.; and Claims System Services,
Inc., Defendants/Counter-Claimants and
Appellees/Cross-Appellants.
 No. 94-56495, 94-56532.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 9, 1996.
Decided Aug. 21, 1996.
 
 1
 Before: GOODWIN and HAWKINS, Circuit Judges, and MARQUEZ[1], District Judge.
 
 MEMORANDUM[2]
 
 2
 Appellants Florie Ayalon ("Mrs. Ayalon") and Hudie Ayalon ("Mr. Ayalon") (collectively, the "Ayalons") appeal the district court's order on summary judgment in their Employee Retirement Income Security Act ("ERISA") (29 U.S.C. § 1001) action against their medical and health insurance plan provided by Appellees AtlantaStaff, Inc. ("ASI") Group Medical and Dental Benefit Program ("the Plan"). The Plan and its administrative services provider, Claims System Services, Inc. ("CSSI")[3], denied Mrs. Ayalon medical coverage for her Gravis myasthenia[4] on the ground that the myasthenia was a pre-existing condition and retroactively rescinded her coverage based on material misstatements and omissions regarding her medical condition.
 
 
 3
 Upon a motion for summary judgment, the district court ruled in the Ayalons' favor that the Plan had wrongfully rescinded her health and medical benefits, however, the district court also determined that Mrs. Ayalon's illness, myasthenia gravis, constituted a pre-existing condition under the terms of the Plan. The district court also denied both parties attorney's fees. ASI cross-appeals the district court's ruling.
 
 BACKGROUND
 
 4
 In January, 1992, Mr. Ayalon was offered medical and health insurance for himself and his family as a benefit of his employment with ASI. On January 31, 1992, Mr. Ayalon completed a Statement of Health Questionnaire on behalf of himself and Mrs. Ayalon and submitted the questionnaire to ASI in connection with his application for coverage under the Plan. The Plan is a self-funded employee welfare benefit plan. ASI is the Plan sponsor and named fiduciary and is responsible for the administration of the Plan, with CSSI, a third-party administrator, acting as claims-paying agent.
 
 
 5
 In the Statement of Health, Mr. Ayalon answered "No" to every question, representing that Mrs. Ayalon (a) did not have any physical impairments or things not considered normal; (b) was not planning for or scheduled for receiving any medical treatment or taking any kind of medication, drugs, shots, etc.; (c) had not had impairment of sight or speech; (d) had not had or been told she had disease or impairment of bones, joints, glands or muscles; (e) had not had any other disease or disorder, surgery or been a patient in a hospital within the last ten years; (f) had not had or been advised to have a surgical operation, x-ray, blood study or other diagnostic tests or services; and (g) had not been consulted, treated or examined by any physician or practitioner during the past five years for any reason not previously mentioned. Mr. Ayalon did not identify any physicians who had attended Mrs. Ayalon and did not identify any medical conditions that she may have had. The Ayalons' coverage became effective on March 1, 1992.
 
 
 6
 On July 8, 1992, Mrs. Ayalon visited Dr. Bruce Becker, with complaints of a droopy eyelid. Dr. Becker ordered initial blood tests and referred Mrs. Ayalon to Dr. Lorne Label. On September 22, 1992, Mrs. Ayalon saw Dr. Label and took a Tensilon test. Shortly thereafter, Mrs. Ayalon was diagnosed with myasthenia gravis.
 
 
 7
 Upon receipt of Mrs. Ayalon's claims relating to her myasthenia, Mr. Brickhouse, the Plan administrator, commenced a pre-existing condition investigation. In a letter dated October 2, 1992, Mr. Brickhouse requested Mr. Ayalon provide the names and addresses of any physicians from whom Mrs. Ayalon had received medical services during the past five years, other than the names listed on the letter. In a letter dated November 6, 1992, Mr. Ayalon stated that in July, 1992, Mrs. Ayalon had seen Dr. Hoffman, the family ophthalmologist, who had referred her to Dr. Becker.
 
 
 8
 In early November, 1992, the Plan and CSSI received Dr. Becker's medical records and office notes relating to his treatment of Mrs. Ayalon. In January, 1993, the Plan made payments on Mrs. Ayalon's claims for medical services and treatments rendered between July 1992 and January 1993.
 
 
 9
 In early 1993, Mrs. Ayalon received pre-authorization from the Plan for admission to UCLA Medical Center where she underwent surgery that helps combat the symptoms and disease of myasthenia. The Plan and CSSI commenced another pre-existing condition investigation based upon information Mr. Brickhouse saw in Dr. Mulder's operative report. Dr. Mulder had preformed a thymectomy on Mrs. Ayalon in February of 1993. In particular, a portion of Dr. Mulder's report stated that Mrs. Ayalon had been diagnosed with myasthenia and that, "in retrospect, her symptoms had been present for about four years at which time she had general aches and pains and weakness which fluctuated." The report also stated that Mrs. Ayalon "had consulted her ophthalmologist because of double vision and was told at that time that she probably had myasthenia" and that a diagnosis of myasthenia was later made.
 
 
 10
 During this second investigation, Mr. Brickhouse requested medical records from Dr. Hoffman, which were received on April 19, 1993. Among these records was a medical report of an examination of Mrs. Ayalon by Dr. Hoffman that occurred on June 11, 1991. Dr. Hoffman's report revealed symptoms of myasthenia.
 
 
 11
 On April 21, 1993, Mr. Brickhouse informed Mrs. Ayalon that her claims were being denied based on their conclusion that her myasthenia was a pre-existing condition. Additionally, Mr. Brickhouse stated that Mrs. Ayalon's coverage was rescinded retroactive to March 1, 1992 (the effective date of coverage) based on material misstatements and omissions in the Statement of Health and on Mr. Ayalon's responses during the pre-existing condition investigations. The Ayalons administratively appealed the Plan's decision and the appeal was denied on July 19, 1993. The Ayalons then brought an action in district court for (1) declaratory relief under ERISA; (2) breach of contract pursuant to ERISA; and (3) attorney's fees under ERISA. ASI counterclaimed for (1) breach of contract; (2) attorney's fees; and (3) declaratory relief.
 
 
 12
 On December 27, 1993, the district court entered an Order dismissing ASI's first and second counterclaims for intentional and negligent misrepresentation on the grounds that they were preempted by ERISA.
 
 
 13
 On August 29, 1994, the district court granted, in part, and denied, in part, the Ayalons' motion for summary judgment. The district court ordered that Mrs. Ayalon's health and medical coverage be reinstated, but ruled that her illness, myasthenia gravis, was a "pre-existing condition" under the Plan. The district court dismissed ASI's counterclaim for breach of contract on preemption grounds. In addition, the district court denied requests for attorney's fees.
 
 
 14
 On appeal, the Ayalons argue that the district court improperly concluded that (1) The Plan administrator did not abuse his discretion when he found that Mrs. Ayalon's myasthenia gravis was a pre-existing condition; (2) ASI is not estopped from rescinding coverage; (3) ASI had not waived the right to rescind coverage; and (4) The Ayalons were not entitled to attorneys fees.
 
 
 15
 On cross-appeal, ASI argues that the district court improperly concluded that (1) rescission of coverage was an abuse of discretion by the Plan administrator; (2) ASI's counterclaims were subject to dismissal; and (3) ASI was not entitled to attorney's fees.
 
 
 16
 This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1294. We affirm in part, reverse in part, and remand in part.
 
 I.
 
 17
 The district court reviews determinations of the Plan administrator regarding Plan benefits based upon an abuse of discretion standard. The district court's application of this standard and its grant of summary judgment are reviewed de novo. Taft v. Equitable Life Assur. Soc., 9 F.3d 1469, 1471 (9th Cir.1993).
 
 
 18
 Pursuant to the Plan, "Claims resulting from Pre-Existing conditions, as defined in the Plan, are excluded from coverage under the Plan...." The Plan defines a Pre-existing condition as an injury or illness:
 
 
 19
 1. For which the Participant has been under the care of a licensed Physician or dentist; or has received medical or dental care; or services; or taken prescription medication; or has used medical equipment, supplies or a prosthesis prescribed by a Physician or dentist within the twelve (12) month period immediately preceding his effective date of coverage, or
 
 
 20
 2. Which has manifested itself, or for which medical or dental advice was given or treatment recommended by or received from a Physician or dentist, whether or not it was treated or diagnosed, within the twelve (12) month period immediately preceding his effective date of coverage.
 
 
 21
 The district court found that Mr. Brickhouse did not abuse his discretion in concluding that Mrs. Ayalon's myasthenia was a pre-existing condition as defined by the Plan.
 
 
 22
 The Ayalons contend that Mrs. Ayalon's myasthenia was not a "pre-existing condition" under the definition set forth in the Plan. They argue that Mrs. Ayalon's June, 1991 visit to Dr. Hoffman was not care or services for myasthenia but was only for care or services for a regular eye examination.
 
 
 23
 The medical examination by Dr. Hoffman revealed that Mrs. Ayalon complained that her eyelid "droops and feels numb every day starting in afternoon x 8 months;" that she experienced "double vision every night x 6 months;" had blurry vision and vision fatigue. Under the impression section of Dr. Hoffman's notes, he wrote "RO myasthenia" and "To neurologist at Kaiser." In his deposition, Dr. Hoffman explained that he had a suspicion that Mrs. Ayalon had myasthenia, that it was a "likely diagnosis," and that myasthenia needed to be ruled out (as opposed to the interpretation that Dr. Hoffman had "ruled out myasthenia"). Dr. Hoffman stated that he "referred her to a neurologist."
 
 
 24
 Pursuant to Ninth Circuit law, ERISA plan terms are to be interpreted in their "ordinary or popular sense." Evans v. Safeco Life Ins. Co., 916 F.2d 1437, 1441 (9th Cir.1990). According to Webster's New World Dictionary, "manifest" is defined as "to make clear or evident; show plainly; or reveal."[5] In order for Mrs. Ayalon's myasthenia to have "manifested itself" during the twelve months preceding the effective date of her coverage, it must have been clear, evident or plainly revealed.
 
 
 25
 Based on substantial evidence, namely, Dr. Hoffman's report, the administrator did not abuse his discretion in concluding that the myasthenia had manifested itself within twelve months before the effective date of coverage.[6]
 
 
 26
 The record supports the determination by Mr. Brickhouse that Mrs. Ayalon's illness was a pre-existing condition. The district court properly determined that the Plan administrator did not abuse his discretion when he concluded that the illness was a pre-existing condition.
 
 II.
 
 27
 The Plan's decision to rescind Mrs. Ayalon's coverage retroactive to the effective date of her coverage was based, in part, on Mr. Brickhouse's determination that there were material misstatements and omissions in the Statement of Health. The district court agreed with this finding. The Plan booklet which was effective at the time of the Appellants' coverage did not provide for rescission; however, the revised Plan booklet contained a provision which provided for rescission:
 
 Misrepresentations
 
 28
 If a material misstatement or omission is made in a statement of health or similar document provided to the Plan Sponsor in connection with an application for coverage under the Plan, all coverage (not just coverage for the specific types of claims as to which the misstatement or omission is material) under the Plan with respect to the person(s) on whose behalf the application was made is void, and the Plan Sponsor may recover, from that person(s) and from any other person, firm or entity (including, without limitation, any service providers), any benefits paid with respect to the person(s).
 
 
 29
 In a letter dated April 21, 1993, ASI informed Mr. Ayalon that Mrs. Ayalon's coverage was being rescinded retroactively to March 1, 1992 based on misstatements and omissions of fact in the Statement of Health. In the letter, Mr. Brickhouse discussed a report from Dr. Mulder which indicated that "This 30-year old woman has had myasthenia gravis symptoms in retrospect for approximately 4 years." Mr. Brickhouse also referenced the examination by Dr. Hoffman where Mrs. Ayalon complained that the " 'right eye droops and feels numb everyday starting in afternoon' for the past eight months and 'right eye double vision every night' for the past six months. Dr. Hoffman's impression was myasthenia." Mr. Brickhouse explained that these health problems were not disclosed on the application for insurance.
 
 
 30
 The issue before this Court is whether Mr. Brickhouse abused his discretion in finding that Mr. Ayalon's Statement of Health contained material misstatements and omissions. Specifically, Mr. Brickhouse indicates in his deposition that Mr. Ayalon made misstatements and omissions in connection with answering questions 5(f), 5(l), 5(n), 5(p), and 3.[7]
 
 Question 5(f)
 
 31
 Question 5(f): "Has the Employee or any Family Member ever ... Had impairment of sight, speech or hearing?"
 
 
 32
 Answer: "No"
 
 
 33
 With regard to Question 5(f), Mr. Brickhouse relied on Dr. Hoffman's report which indicated that Mrs. Ayalon had various vision problems. "According to Dr. Hoffman's records, the patient stated that she had been having trouble with double vision for the previous six to eight months.... which would be an impairment of sight." The Ayalons contend that "impairment of sight" includes only very serious conditions such as impaired by blindness, loss of an eye, cataracts or any other condition which was of a more serious nature. They also contend that the term "impairment of sight" is susceptible to at least two different meanings. Mr. Brickhouse concluded that "In my mind, impairment of sight would be not being able to see very well; double vision would be an impairment of sight in my mind." According to Webster's New World Dictionary, an impairment does not have to be as serious as the Ayalons argue, an impairment can simply include a decrease or a weakening. See also, Black's Law Dictionary 677 (5th ed. 1979). Mr. Brickhouse did not abuse his discretion when he interpreted "impairment of sight" to include Mrs. Ayalon's vision problems.
 
 
 34
 This Court must also address the issue of whether the alleged misstatements or omissions were material. In accordance with traditional insurance law "materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is made." California Insurance Code § 334; See, also, Gasaway v. Northwestern Mutual Life Insurance Co., 26 F.3d 957, 959 n. 3 (9th Cir.1990) (In agreement with the majority rule, a misrepresentation "need only relate to the insurance company's decision to insure the risk."). Furthermore, the fact that an insurance application asks for certain information usually is sufficient to establish materiality as a matter of law. Taylor v. Sentry Life Ins. Co., 729 F.2d 652, 654 (9th Cir.1984) (citations omitted). The fact that Mr. Ayalon was asked about Mrs. Ayalon's impairment of sight indicates that the information was considered material.
 
 
 35
 The district court did not err when it concluded that Mr. Brickhouse did not abuse his discretion in concluding that the omission was material.
 
 
 36
 The next issue goes to the applicant's knowledge. The district court relied on California insurance law and on Thompson v. Occidental Life Insurance Co. of Cal., 109 Cal.Rptr. 473 (Cal.1973). The district court held that in rescinding Mrs Ayalon's coverage, Mr. Brickhouse abused his discretion because he did not have any substantial evidence that Mr. Ayalon knew and appreciated the significance of Mrs. Ayalon's symptoms, her consultation with Dr. Hoffman in 1991, or Dr. Hoffman's referral to a neurologist to rule out myasthenia.
 
 
 37
 The Plan does not contain a requirement that the misstatement or omission be intentional or negligent. The Plan does not create, or speak in terms of, a fraud standard. The plain language of the Plan only requires that if a material misstatement or omission is made, insurance coverage will be void. The question is not one of applying California insurance law; it is a question of enforcing the unambiguous terms of the plan as required by ERISA. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110 (1989); See also, Evans, 916 F.2d at 1441 (9th Cir.1990).
 
 
 38
 The claims for rescission and restitution are claims under ERISA. 29 U.S.C. § 1132(a)(3). ERISA preempts state laws insofar as they relate to employee benefit plans. 29 U.S.C. § 1144(a). California insurance law concerning knowledge and appreciation of significance of symptoms is preempted by ERISA. 29 U.S.C. § 1144(a). California's knowledge/appreciation rule is not a law that "regulates insurance" within the meaning of the ERISA savings clause, 29 U.S.C. § 1144(b)(2)(A), and therefore does not avoid preemption. See, Tingle v. Pacific Mut. Ins. Co., 996 F.2d 105, 107 (5th Cir.1993); See also, Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724 (1985).
 
 
 39
 The record before the administrator provides substantial evidence establishing the fact that Mr. Ayalon had to be fully aware that Mrs. Ayalon had an impairment of sight. Mr. Ayalon's responses to questions in the questionnaire were to be completed to the best of his knowledge and belief. It is incredible that Mr. Ayalon would not have knowledge that: (1) his wife had worn glasses for over ten years; (2) his wife had "headaches or trouble with [her] vision....;" (3) his wife had other various vision problems (i.e. droopy and numb eyelid for eight months, and double vision for six months); and (4) his wife had been referred to a neurologist by Dr. Hoffman.[8]
 
 
 40
 Based on substantial evidence contained in the record, the administrator did not abuse his discretion in concluding that Mr. Ayalon made material misstatements in answering questions in the questionnaire. The district court erred when it concluded that there was an abuse of discretion and granted summary judgment in favor of the Ayalons, giving them coverage under the Plan.
 
 III.
 
 41
 The district court held that ASI was not equitably estopped from rescinding the Ayalons' coverage. "This court ... has recognized that federal equitable estoppel principles can, in certain circumstances, apply to some claims arising under ERISA." Greany v. Western Farm Bureau Life Ins. Co., 973 F.2d 812, 821 (9th Cir.1992). The federal common law elements of equitable estoppel are:
 
 
 42
 (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.
 
 
 43
 Id. (citation omitted). The Ayalons argue that their reliance on ASI's payment and their continuing to provide benefits after the first investigation estopped ASI from later rescinding coverage.
 
 
 44
 The Ayalons rely on Fitch v. Arkansas Blue Cross Blue Shield, 795 F.Supp. 904 (W.D.Ark.1992), where the court held that the Plan was estopped from denying payments for benefits with regard to the plaintiff's carpal tunnel syndrome. The court found that the defendant had failed to assert the pre-existing condition provision of the plan in connection with the processing of the three prior requests for payment of benefits and was estopped from denying benefits. Id. at 908.
 
 
 45
 Fitch can be distinguished upon the facts. In the case at bar, in addition to the question regarding a "pre-existing" condition on the Statement of Health, the administrator requested records regarding Mrs. Ayalon's medical conditions on at least two occasions. The administrator made these requests in connection with a possible pre-existing condition. Furthermore, the administrator conducted two separate investigations. During the first investigation, the administrator processed the claims after Mr. Ayalon had falsely informed ASI that there was not a pre-existing condition problem. It was during the second pre-existing condition investigation that the administrator discovered the reports from Dr. Mulder and Dr. Hoffman which ultimately led ASI to rescind the Ayalons' benefits.
 
 
 46
 The district court did not err in finding that ASI was not equitably estopped from rescinding the Ayalons' coverage.
 
 IV.
 
 47
 The Ayalons contend that ASI waived the right to rescind the medical coverage after the initial investigation. Specifically, they argue that the Plan was aware of Mrs. Ayalon's visit to Dr. Hoffman and Kaiser, but failed to follow up by obtaining Mrs. Ayalon's medical records. See Rutherford v. Philadelphia Ins. Co., 44 Cal.Rptr. 697, 706 (Cal.Dist.Ct.App.1965) (an insurer cannot sit back and collect premiums until a claim arises, and then assert the misrepresentation as a basis to rescind.). The Ayalons argue that ASI's failure to contact Kaiser or Dr. Hoffman constituted a waiver of their right to rely on any information contained therein but discovered later. The record indicates that ASI was not aware of the visit to Dr. Hoffman until they conducted the second pre-existing investigation. Once learning from Dr. Mulder's report that Mrs. Ayalon had been having symptoms for four years, Mr. Brickhouse contacted Dr. Hoffman and requested medical records. The record does not contain any evidence that the ASI waived its right to rescind coverage.
 
 
 48
 The district court did not err when it found that the ASI had not waived the right to rescind coverage.
 
 V.
 
 49
 ASI appeals the district court's dismissal of ASI's first (intentional misrepresentation), second (negligent misrepresentation), and third (breach of contract) counterclaims on the grounds that they were preempted by ERISA. Preemption is a question of law that the Court of Appeals reviews de novo. MSR Exploration, Ltd., v. Meridian Oil, Inc., 74 F.3d 910, 912 (9th Cir.1996).
 
 
 50
 The relevant preemption provision of ERISA provides that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). Furthermore, "this preemption provision extends to all state common law causes of action--provided, of course, that they relate to an employee benefit plan." Olson v. General Dynamics Corp., 960 F.2d 1418, 1420 (9th Cir.1991), cert. denied, 504 U.S. 986 (1992) (citations omitted). This preemption clause is "deliberately expansive, and designed to establish pension plan regulation as exclusively a federal concern." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 46 (1987) (internal quotation omitted). "ERISA contains one of the broadest preemption clauses ever enacted by Congress.... Accordingly, claims relating to a benefit plan, whether founded on an alleged contract, (citation omitted), or based on tort theories, (citation omitted), are preempted by ERISA." Joanou v. Coca-Cola Co., 26 F.3d 96, 99 (9th Cir.1994).
 
 
 51
 In view of this Court's expansive reading of ERISA preemption, the district court did not err when it dismissed ASI's counterclaims for negligent misrepresentation, intentional misrepresentation, and breach of contract.
 
 VI.
 
 52
 The district court denied both the Ayalons' and ASI's requests for attorney's fees. "The grant or denial of an attorney's fees award is committed ... to the discretion of the district court, and it will not be disturbed unless there is a showing that the court abused its discretion." Operating Engineers Pension Trust v. Beck Engineering & Surveying Co., 746 F.2d 557, 569 (9th Cir.1984). The district court denied attorney's fees to both parties without giving any reasons. "Because the court rendered its decision without discussion, we cannot determine whether or not the denial of ... fee[s] was an abuse of discretion." Barker v. American Mobil Power Corp., 64 F.3d 1397, 1404 (9th Cir.1995); Hummell v. S.E. Rykoff & Co., 634 F.2d 446, 452 (9th Cir.1980). This Court must remand to the district court to allow it to present an explanation of the reasons that support its decision. Id.
 
 VII.
 
 53
 The Ayalons also request attorney's fees for the time expended in bringing this appeal. We have considered the factors set forth in Hummell, 634 F.2d at 453.
 
 
 54
 The Ayalons' request for attorney's fees and costs incurred in bringing this appeal is denied.
 
 CONCLUSION
 
 55
 The judgment of the district court is affirmed in part, reversed in part, and remanded in part.
 
 
 56
 The district court did not err when it granted summary judgment finding that the administrator had not abused his discretion when he found that Mrs. Ayalon's myasthenia gravis was a pre-existing condition.
 
 
 57
 The district court erred in granting summary judgment for the Ayalons finding that the administrator abused his discretion in rescinding coverage retroactively.
 
 
 58
 The district court's denial of attorney's fees is remanded to the district court.
 
 
 59
 The Ayalons' request for attorney's fees incurred upon appeal shall be denied if they file a request for attorney's fees under 29 U.S.C. § 1132(g)(1).
 
 
 
 [1]
 The Honorable Alfredo C. Marquez, Senior United States District Judge for the District of Arizona, sitting by designation
 
 
 [2]
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [3]
 The Appellees ASI, the Plan, and CSSI are collectively referred to as "ASI"
 
 
 [4]
 Myasthenia gravis is a chronic neuromuscular disorder characterized by serious muscle weakness and fatigue
 
 
 [5]
 This is the definition of "manifested" which the district court used below
 
 
 [6]
 It is noteworthy that under the Plan, it was not necessary that the condition be conclusively diagnosed as myasthenia in order to be manifested. A pre-existing condition includes an illness which has manifested "[w]hether or not it was treated or diagnosed...."
 
 
 [7]
 Questions 5(l), 5(n), 5(p), and 3 and the responses to those questions are not determinative to this Court's decision and will not be discussed
 
 
 [8]
 ASI contends that the district court erred in refusing to consider later-discovered evidence of misstatements and omissions in connection with the rescission claim. It is not necessary to consider this argument for purposes of this Court's decision