**Steven DUNNER, Plaintiff,**

v.

**UNIVERSITY OF SOUTHERN CALIFORNIA LONG TERM DISABILITY PLAN, Defendant.**

**No. CV 09–01732 SJO (Ex).**

United States District Court, C.D. California.

March 7, 2011.

Russell G. Petti, The Law Offices of Russell G. Petti, La Canada, CA, for Plaintiff.

Robert L. Fairman, Norton & Fairman, Los Angeles, CA, for Defendant.

## ORDER GRANTING PLAINTIFF STEVEN DUNNER'S MOTION FOR SUMMARY JUDGMENT [Docket No. 15]

S. JAMES OTERO, District Judge.

This matter is before the Court on Plaintiff Steven Dunner's ("Dunner" or "Plaintiff") Motion for Summary Judgment, filed on October 26, 2009. Defendant University of Southern California ("USC") Long Term Disability Plan ("Defendant") filed an Opposition, to which Plaintiff replied. The Court found this matter suitable for disposition without oral argument and vacated the hearing set for November 16, 2009. *See* Fed.R.Civ.P. 78(b). For the following reasons, Plaintiff's Motion for Summary Judgment is **GRANTED.**

## I. *BACKGROUND*

### A. *Factual Background*

For purposes of this Order, the following facts are presumed to be true, unless otherwise stated. On September 13, 2000, Plaintiff suffered an injury during the course of his employment with the County of Los Angeles (the "County"), which resulted in a level of permanent disability (the "County Injury"). (Pl.'s Statement of

Uncontroverted Facts and Conclusions of Law ("Pl.'s SUF") ¶ 1; Compl. ¶¶ 1, 5; Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") 1.) Plaintiff filed a workers' compensation claim against the County based on his disability and later found a job at USC that he could perform, despite the disability. (Pl.'s SUF ¶ 3.) "Because of his employment with USC, [Plaintiff] became covered by the LTD Plan [the "Plan" or the "USC Plan"], and was entitled to disability benefits if he became disabled pursuant to [the USC Plan's] terms." (Compl. ¶ 7.) Plaintiff alleges that while employed by USC, he "suffer[ed] a disabling injury, arising out of an assault by another USC employee. Because of this new injury, [Plaintiff] became disabled pursuant to the terms of the ... Plan."[1] (Compl. ¶ 8.) Plaintiff filed a disability claim with the USC Plan, based on this "USC Injury."[2] (Compl. ¶ 8.)

"The ... [USC] Plan agreed that [Plaintiff] was disabled[,] pursuant to its terms and agreed to pay him benefits." (Compl. ¶ 11; Def.'s SOF ¶ 5; Petit Decl., Ex. B pp. 44–45, 54–55.) Plaintiff states: "USC has continued to acknowledge [his] disability up through the present, and whether [Plaintiff] is disabled is not an issue in this lawsuit." (Pl.'s Mot. 3.) In August 2008, the workers' compensation claim for Plaintiff's [County] [I]njury reached a conclusion.[3] (Pl.'s Mot. 1, 5; Pl.'s SUF ¶ 10; Compl. ¶ 12.) The workers' compensation Order found that Plaintiff had been in-

1. In particular, Plaintiff alleges that he "continued to suffer from a constellation of medical problems. He had persistent neck pain and headaches, unstable blood pressure, hypertension, and dizziness. He also suffered from anxiety and depression. Eventually his treating physician, Dr. Stephen B. Kramer ["Dr. Kramer"], opined that [Plaintiff] was no longer able to work because of his medical problems. [Plaintiff] ceased work at USC on November 6, 2001." (Pl.'s Mot. 3.)

2. Defendant asserts: "USC was the [P]lan sponsor, [P]lan administrator, and named fiduciary as such terms are used in ERISA; while Sedgwick Claims Management Service ["Sedgwick"] was the claims administrator duly appointed by USC to handle [USC] Plan claims processing." (Def.'s Opp'n 7.)

3. Defendant states that Plaintiff's claim for workers' compensation against USC, filed on November 19, 2001, "was denied by USC leading to the [Workers' Compensation Administrative Board ("WCAB")] trial and findings of no liability on the part of USC." (Def.'s Opp'n 9; Def.'s Trial Brief 8.) Defendant continues: "The USC WCAB claim was consolidated with the County's WCAB matter for hearing, and the WCAB judge found on September 10, 2008, that [P]laintiff here did not suffer any injury from the purported USC incident, leaving the only source of disability arising from the County [I]njury to support [P]laintiff's claim here." (Def.'s Opp'n 9.)

Defendant's Statement of Facts asserts: "The WCAB claims of [P]laintiff against both the County and USC were consolidated and heard by one hearing officer who ruled on both claims at the same time." (Def.'s SOF ¶ 37.) However, Defendant's Statement of Facts does not dispute that "USC has continued to acknowledge [Plaintiff's] disability up through the present, and whether [Plaintiff] is disabled is not an issue in this lawsuit." (Def.'s Statement of Genuine Issues in Opp'n to Mot. for Summ. J. ("Def.'s SOF") ¶ 55.) Plaintiff disputes that his workers' compensation claims were consolidated: "these two exhibits Nos. 5 and 6 [of the Fairman Declaration] do not indicate that [Plaintiffs] two workers' compensation cases were consolidated. Fairman exhibits 5 and 6 both deal solely with [Plaintiff's] workers' compensation claim against USC, finding that [Plaintiff] did not sustain a compensable workers' compensation injury while working at USC. [Plaintiff's] workers' compensation claim against the County, on the other hand, has a separate case number (ADJ2107146). The Order from this claim reaches the result that [Plaintiff] did suffer a compensable workers' compensation injury while working for the County. There is no evidence that these awards were subject to consolidation." (Pl.'s Reply 9.) Plaintiff also states: "the USC Plan accepted and paid [Plaintiff's] claim for disability, which was explicitly based on his injury to his shoulder, cervical spine, as well as his hypertension and

jured in September 2000 while working for the County, and which resulted in permanent disability of 69%, so that Plaintiff was entitled to a total sum of $71,102.50 in compensation, less $10,665, to be deducted for attorneys' fees. (Pl.'s SUF ¶¶ 11, 12; Compl. ¶ 12.) "[Plaintiff] was [therefore] found to be entitled to disability benefits in the amount of $170 per week, from March 7, 2002 up through December 31, 2008."[4] (Pl.'s Mot. 1, 5; Pl.'s SUF ¶ 13.) "[Plaintiff] recalls that most of the $60,437.50 came as a lump sum, with two or three months of payments added on." (Pl.'s Mot. 6; Petit Decl., Ex. B pp. 35–41.)

"Pursuant to his agreement with the . . . [USC] Plan, [Plaintiff] notified the . . . [USC] Plan of the receipt of this payment." (Compl. ¶ 12.)

Following Plaintiff's worker's compensation award for the County Injury, Sedgwick Claims Management Services, Inc. ("Sedgwick"), the administrator of the USC Plan, took Plaintiff's workers' compensation award for the County Injury as an offset against future benefits Plaintiff would receive under the USC Plan, pursuant to "Reductions Because of Other Benefits Payable," paragraph 3.06 of the USC Plan.[5] (Pl.'s SUF ¶ 15; Compl. ¶ 13; Def.'s

depression. The USC Plan has been paying [Plaintiff's] claim for years. The USC Plan never disputed [Plaintiff's] disability, and only stopped paying his claim because of the offsets that are the subject of this lawsuit." (Pl.'s Reply 10.)

4. Plaintiff states that he was entitled to 418.25 weeks of disability, which "works out to slightly over eight years, so the apparent period of disability over which [Plaintiff] was awarded these payments was March 7, 2002 through March of 2010. However, the Order required that $10,665 be deducted from the award as attorney fees, and that these fees be taken from the last weeks of disability benefits: 'IT IS ORDERED that the sum of $10,665.00 to be commuted from the final weekly payments of permanent disability in order to pay attorney fees awarded herein.' At $170 per week, the remaining $60,437.50 in the award would run for only 6 years, 43 weeks and 5 days. As such, the workers' compensation award was paid for a period of disability running from March 7, 2002 through December 31, 2008." (Pl.'s Mot. 5.)

5. Paragraph 3.06 of the USC Plan provides: "Such benefits as described in Section '3.05' above shall be reduced by the amount of any of the following 'other benefits' (converted comparable monthly or daily equivalents, as appropriate) which the Plan administrator determines are available to the Participant (whether or not such benefits are applied for) for the same period of Disability for which benefits are payable hereunder: (A) Any salary, wages, commissions, retirement or pension benefits, or similar renumeration the Participant receives, or is entitled to receive, while eligible for benefits under this Plan. (B) Any federal Social Security benefits for which the Participant and his dependents are eligible because of the Participant's Disability or retirement under Social Security (Old Age, Survivors, Disability and Health Insurance) of the United States. For purposes of computing this offset, any statutory cost of living increases awarded after the initial Social Security Award date, will not be used. However, if the initial award is subsequently adjusted to give credit for additional earnings or for any other reason, other than a statutory cost of living increase, the new award will be offset. (C) Benefits paid or claimed pursuant to any occupational disease law, any state or federal workers' compensation or Disability law, or other law of similar purpose; such benefits shall include, but shall not be limited to, temporary or permanent disability payments (whether total or partial), and vocational rehabilitation payments. Any amount awarded or paid in a lump sum, in accordance with any one of the workers' compensation plans as mentioned above, whether voluntarily or by operation of law, shall be deducted from the Plan benefit payable commencing from the date of the claim, award, or settlement, and continuing for as many future months as is necessary to equal the amount of such lump sum. (However, before computing the reduction to the Employee's Plan benefit on single sum awards or settlements, the Administrator will subtract any approved medical expenses and attorney's fees which were incurred prior to the award.)."

Opp'n 10.) Sedgwick informed Plaintiff that the entire amount of the alleged overpayment would be taken from future benefits under the USC Plan:

> The Findings and Award settlement was for $71,102.50 less attorney's fees in the amount of $10,665.00. This leaves a balance of $60,437.50. This amount will be applied toward your future [USC] monthly adjusted gross amounts of $2,334.92, effective November 1, 2008 until benefits withheld equals $60,437.50. We have calculated the length of time benefits will be withheld and determined that your [USC] benefit payments will commence again in December 2010.

Pl.'s Mot. 6; Def.'s Mot. 7 ("The [USC] Plan took an offset based upon an award of workers' compensation permanent disability benefits to [P]laintiff covering the same time period that [P]laintiff was receiving [USC] Plan benefits."); Petit Decl., Ex. B pp. 38–42. Consequently, Plaintiff has not collected benefits under the USC Plan since December 1, 2008, and was not scheduled to resume collecting benefits until December 2010. (Pl.'s SUF ¶¶ 15, 16.) Plaintiff now complains, however, that "there are clearly two different losses, and the . . . [USC] Plan should not be permitted to reduce Plaintiff's current disability benefits because of compensation he received for the [County Injury]." (Pl.'s Mot. 1.)

**6.** Plaintiff claims that Sedgwick's response was deficient for the following reasons: (1) "Failed to refer to the 'specific plan provisions on which the benefit determination is based.'" 29 C.F.R. § 2560.503–1(j)(2); (2) "Failed to inform [Plaintiff] of his right to receive and inspect documents." 29 C.F.R. § 2560.503–1(j)(3); (3) "Failed to inform [Plaintiff] of right to bring an action under section 502(a)." 29 C.F.R. § 2560.503–1(j)(4); and (4) "Failed to include the mandatory statement that [Plaintiff] could contact his state insurance regulator or the DOL." C.F.R. § 2560.503–1(j)(5)(iii). (Pl.'s Mot. 7, 29.)

## B. Procedural Background

Following receipt of a letter Plaintiff received from Sedgwick on October 28, 2008 (the "October 28, 2008 Letter"), Plaintiff appealed the USC Plan's determinations. (Compl. ¶ 16; Pl.'s Mot. 7.) Plaintiff asserts that his appeal "provided Sedgwick with a copy of the Reimbursement Agreement[,] which clearly indicated that the offsets should only be taken for other benefits awarded as a result of the 'same injury or illness.'" (Pl.'s Mot. 7.) On January 5, 2009, Sedgwick acknowledged Plaintiff's appeal: "We are in receipt of your request to appeal the overpayment on your Long Term Disability Claim. Your letter was received on December 12, 2008." (Compl. ¶ 17.) Sedgwick denied Plaintiff's appeal on January 12, 2009: "As I indicated in my letter to you dated October 28, 2008, the [USC] Plan does not indicate benefits paid is recoverable if you receive a settlement for the same period of time you are entitled to LTD] benefits. The [USC] Plan document is the legal document." [6] (Pl.'s Mot. 7; Petit Decl., Ex. B p. 43.)

Subsequent to this, Plaintiff filed the instant action, pursuant to 29 U.S.C. §§ 1132(a), (e), (f), and (g) of the Employee Retirement Income Security Act of 1974 ("ERISA"), alleging that the USC Plan made improper reductions in the amount of USC Plan benefits he was owed.[7] (See generally Compl.) Defendant

**7.** "The existence of an ERISA plan is a question of fact, to be answered in light of all the surround facts and circumstances from the point of view of a reasonable person." Kanne v. Conn. Gen. Life Ins. Co., 867 F.2d 489, 492 (9th Cir.1988). Plaintiff asserts that this action is properly brought under 29 U.S.C. § 1132 because "it involves a claim by [him] for employee benefits under employee benefit plans regulated and governed under ERISA. Jurisdiction is predicated under these code sections, as well as 28 U.S.C. § 1331, as this action involves a federal question." (Compl. ¶ 1.) "Federal law specifically provides that a beneficiary of a plan subject to ERISA may sue to recover benefits due to him under the

does not dispute that ERISA governs the USC Plan. (Def.'s Opp'n 13.) Plaintiff asserts in relevant part:

> This action is brought for the purpose of obtaining benefits under the terms of an employee benefit plan; to clarify and enforce [Plaintiff's] past, present, and future rights to benefits under the employee benefit plan named herein as Defendant; and, to obtain other equitable relief, including but not limited to, restitution, an injunction ordering Defendant to pay [Plaintiff] benefits to which [Plaintiff] is entitled; for prejudgment and postjudgment interest; and for attorneys' fees and costs.

(Compl. ¶ 1.) Plaintiff moved for summary judgment on October 26, 2009, but which the Court denied on December 18, 2009, "[b]ecause factual disputes remain as to the intended purpose of the [USC] Plan's setoff provision, as well as with respect to the injuries Plaintiff allegedly suffered." Order of Dec. 18, 2009; *see generally* Pl.'s Mot.) The Court instructed the parties to "submit additional briefing regarding the [USC] Plan's language, the intended purpose behind the [USC] Plan, and the injuries for which Plaintiff contends he is entitled to benefits under the [USC] Plan." (Order of Dec. 18, 2009.) The parties submitted additional briefing. (Additional Trial Brief of Def. ("Def.'s Addtn'l Trial Brief") 2.)

## II. *DISCUSSION*

### A. *Legal Standard for Summary Judgment*

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, when addressing a motion for summary judgment, the Court must decide whether there exist "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Id.* at 256, 106 S.Ct. 2505. Moreover, when the moving party is the plaintiff, he or she has the burden to demonstrate affirmatively that there is no genuine issue of material fact as to each element of his or her claim for relief, as well as to demonstrate the lack of any genuine issue of material fact as to affirmative defenses asserted by the defendant by pointing out the absence of evidence provided by the defendant. *Zands v. Nelson*, 797 F.Supp. 805, 808 (S.D.Cal.1992); *see also Grimmway Enterprises, Inc. v. PIC Fresh Global, Inc.*, 548 F.Supp.2d 840, 845 (E.D.Cal.2008).

In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all "justifiable inferences" are drawn in that party's favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Where there is no evidence demonstrating the existence of a genuine issue of material fact, the moving party may prevail simply by "pointing out to the district court ... that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As the Supreme

---

terms of his plan, to enforce his rights under the terms of the plan, and to clarify his right to future benefits under the terms of the plan.... Manifestly included within that authorization is the power for a district court to determine what benefits are due and to award them." *See Welsh v. Burlington N., Inc., Emp. Benefits Plan (Welsh)*, 54 F.3d 1331, 1339–40 (8th Cir.1995) (internal citations omitted); *see* 29 U.S.C. § 1132(a)(1)(B).

Court emphasized: "Where the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### B. *Standard of Review for Cases Arising Under ERISA*

 "Consistent with established principles of trust law ... a denial of benefits challenged under [ERISA] ... is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[8] *Firestone Tire and Rubber Co. v. Bruch (Firestone)*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see Jebian v. Hewlett–Packard Co. Empl. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1105 (9th Cir.2003) ("The principle underlying these wrong decision-maker cases is that although *Firestone* directs courts to defer to the decisions of plans in which their language grants discretionary authority, that deference applies only when the decision is made by the body vested with discretion."). Here, the USC Plan does not vest authority in the administrator to construe its terms, and thus, the Court reviews Plaintiff's eligibility for benefits under the USC Plan under a *de novo* standard of review, pursuant to *Firestone*, and which neither party disputes. (Pl.'s Reply 5; Pl.'s Supp. Brief 10.)

 The interpretation of terms in an ERISA plan is often crucial in determining whether a participant is eligible for benefits under the ERISA plan. *Firestone*, 489 U.S. at 115, 109 S.Ct. 948. In *Abatie v. Alta Health & Life Insurance Company*, the Ninth Circuit held that "general trust principles apply when considering how district courts should review ERISA denial benefits cases, because the plan administrator stands in a fiduciary relationship to the plan participants." *Abatie v. Alta Health & Life Ins. Co. (Abatie)*, 458 F.3d 955 (9th Cir.2006). As such, "the starting point is the wording of the plan." *Id.* at 963. To that end, "when disputes arise, courts should first look to explicit language of the agreement to determine, if possible, the clear intent of the parties." *Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1194 (9th Cir.2007) (quoting *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir.1991)). Thus, courts interpret terms in ERISA plans "in an ordinary and popular sense," and must not "artificially create ambiguity where none exists." *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir.1990).

 Plan administrators therefore discharge their duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1). By requiring that ERISA plans be placed in writing, employees are protected from having plans modified without their knowledge, and administrators are prevented from paying "benefits to persons not entitled to them under the express terms of the plan." *Greany v. W. Farm Bureau Life Ins. Co.*, 973 F.2d 812, 822 (9th Cir.1992) (citing *Rodrigue v. W. and S. Life Ins. Co.*, 948 F.2d 969, 971 (5th Cir.1991)). Additional-

---

**8.** "Where, as here, a district court has conducted a *de novo* review of an ERISA plan administrator's decision, we review the court's factual findings only to determine whether they are clearly erroneous." *Muniz v. Amec Construction, Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir.2010).

ly, each provision of a plan should be interpreted consistent with the entire document, and only if a plan is ambiguous, should a court "examine extrinsic evidence to determine the intent of the parties." *Gilliam,* 488 F.3d at 1194 (internal citations omitted).

■ Nonetheless, in reviewing benefits under a plan, district courts may consider evidence outside of the administrative record in determining the nature, extent, and effect of conflict of interest. *See Abatie,* 458 F.3d at 955. In *Abatie,* the Ninth Circuit explained:

> a district court may review only the administrative record when considering whether the plan administrator abused its discretion, but may admit additional evidence on *de novo* review.... The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise.

*Id.* at 970. For example, when a plan administrator fails to follow ERISA's procedural requirements, "the court may have to consider evidence outside the administrative record." *Id.* at 973. As such, in *Abatie,* the Ninth Circuit held that the district court's refusal to consider "additional evidence—a declaration from [the claimant's doctor]—to prove that [the claimant] had remained totally disabled continuously from the date he left work until the date he died," was made in error. *Id.* at 974. In *Muniz,* the Ninth Circuit explained:

> a district court, when exercising *de novo* review of an ERISA benefits denial decision, may admit additional evidence when circumstances clearly establish that additional evidence is necessary to

conduct an adequate *de novo* review of the benefit decision.... Such evidence may include the opinion of an independent expert.

*Muniz,* 623 F.3d at 1297 (internal citations omitted); *see Gardner v. Bear Creek Corp.,* 2007 WL 2318969, *18 (N.D.Cal. Aug. 6, 2007) (citing *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,* 46 F.3d 938, 943–44 (9th Cir.1995)).

### C. Burden of Proof for Cases Arising Under ERISA

■ ERISA "allows a claimant to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Muniz,* 623 F.3d at 1294, 1296. Though, "when the court reviews a plan administrator's decision under the *de novo* standard of review, the burden of proof is placed on the claimant." *Id.*; *see Horton v. Reliance Standard Life Ins. Co.,* 141 F.3d 1038, 1040 (11th Cir.1998) ("A plaintiff suing under [29 U.S.C. § 1132(a)(1)(B) ] bears the burden of proving his entitlement to contractual benefits."); *see also Farley v. Benefit Trust Life Ins. Co.,* 979 F.2d 653, 658 (8th Cir. 1992) (internal citations omitted) ("[W]e agree that it was [the claimant's] burden to show that he was entitled to the benefits ... under the terms of his plan.").

### D. The Language of the Plan

■ The USC Plan permits offsets against certain other benefits that claimants may receive. In particular, § 3.06 of the USC Plan provides:

> Such benefits as described in [§ ] 3.05 above shall be reduced by the amount of any of the following "other benefits" (converted to comparable monthly or daily equivalents, as appropriate) which the Plan Administrator determines are

available to the Participant (whether or not such benefits are applied for) *for the same period of Disability* for which benefits are payable hereunder.

(Pl.'s Mot. 3; Pl.'s SOF ¶ 6) (emphasis added). Plaintiff asserts that because the term "Disability" is capitalized, it is a specially defined term within the USC Plan: "the [USC] Plan document defines 'Disability' to mean 'the condition for which the Participant is claiming benefits is disabling within the meaning of Title II of the Federal Social Security Act' (after 12 months of benefits have run)." (Pl.'s Mot. 4; Pl.'s SOF ¶ 7.) Second, Plaintiff argues that the language "for the same period of Disability for which benefits are payable thereunder," is intended to be language of limitation: "In other words, 'other benefits,' which are not 'for the same period of Disability,' may not be taken as offsets." (Pl.'s Mot. 8.)

Therefore, Plaintiff argues that "[t]he language of the [USC] Plan does not permit ... offset[s] [to] current benefits for other benefits which were awarded for a different loss or injury." (Pl.'s. Mot. 8.) Instead, Plaintiff alleges that it is reasonable and fair to interpret the USC Plan as permitting offsets only for other benefits that stem from the same "loss." (Pl.'s Mot. 10.) To that end, Plaintiff argues that the language at issue is akin to an insurance policy "coordination of benefits" clause, which is intended "to prevent insureds from being compensated twice for a single loss." (Pl.'s Mot. 10; Pl.'s Supplemental Mem. in Response to This Court's Request for Additional Briefing ("Pl.'s Supp. Brief") 2.) In *Commerce & Industry Insurance Co v. Chubb Custom Insurance Company*, the California Court of Appeal explained: "Insurance policies commonly included other insurance provisions which attempt to limit the insurer's liability to the extent that other insurance covers the same risk." *Commerce & Indus. Ins. Co. v. Chubb Custom Ins. Co.*, 75 Cal.App.4th 739, 89 Cal.Rptr.2d 415 (1999). Plaintiff asserts:

> It would make no sense to permit an insurer to escape liability for a covered loss under a coordination of benefits provision, where the insured is being compensated for an entirely different loss. To do so would not meet the provision's goal of preventing a double recovery. Rather, the insured would receive less compensation for a loss than he was entitled to.

(Pl.'s Mot. 11.) Accordingly, Plaintiff contends that the USC Plan's language is clear—it may only offset "current benefits for other benefits which were awarded for a different loss or injury." (Pl.'s Supp. Brief 2; Pl.'s Mem. 8.)

#### 1. *Welsh v. Burlington Northern, Inc., Employee Benefits Plan*

Plaintiff also relies on *Welsh v. Burlington Northern, Inc., Employee Benefits Plan*, which held that other benefits received by a plan participant may be offset only where they stem from the same "loss" or "injury" as the present disability. *See Welsh v. Burlington N., Inc., Emp. Benefits Plan (Welsh)*, 54 F.3d 1331, 1338–39 (8th Cir.1995). In *Welsh*, plaintiff Welsh ("Welsh") injured his lower back while at work, and consequently, moved to another position within the same company. *Id.* at 1334. Several years later, when dye was injected into his spine for diagnostic purposes, Welsh became totally disabled from "Arachnoiditis." *Id.* Welsh's employer paid disability benefits for the Arachnoiditis, but then informed Welsh that no further benefits would be made, so that Welsh sued the health insurance plan, "alleging that it was improper for the health insurance plan to use the [Federal Employers' Liability Act] ("FELA") award as

a setoff to the disability benefits that he was entitled to receive."[9] *Id.* at 1335.

Welsh argued that the damages in the FELA lawsuit and the payment that compensated him for the Arachnoiditis represented two different injuries: one for the loss of wages due to the inability to continue work in a position before he injured his back (partial disability), and the other for compensation received for the loss of wages due to the inability to work at all (total disability). *Welsh,* 54 F.3d at 1337. The district court concluded that the two injuries were indeed separate, and which the Eighth Circuit found compelling:

> [I]n other words ... Welsh's back injury was not the cause of his disability—and therefore ... the health insurance plan was not entitled to use the FELA award as a setoff to the amounts due to Welsh under the disability benefits contract.... That is because the purpose of the setoff provision in FELA is to prevent the imposition upon an employer of double liability for one loss.

*Id.*

In *Welsh,* the Eighth Circuit found unreasonable Defendant's claim that it was independently entitled to a setoff under FELA because the health insurance plan contained language that stated that disability benefits are to be reduced "by any amount" paid to the employer under FELA:

> We consider that to be entirely unreasonable construction of the contract, since it would be completely irrational to claim, for instance, a right to a setoff based on a FELA award for an injured foot when the basis for an employee's entitlement to disability benefits was total incapacitation from a stroke unrelated in any way to the foot injury.

*Welsh,* 54 F.3d at 1338. The court further explained that the disability benefits contract contained no language requiring "the same injury" to be the basis for a setoff of a FELA award against disability payments:

> [I]n the absence of such language ... the most reasonable construction of that contract is that in order for a FELA award to be used as a setoff, that award must be for 'the same loss,' which does not necessarily meant for 'the same injury'.... There is, moreover, an additional reason why a setoff is inappropriate in this case—because the [employer] faces no double liability for any portion of Welsh's lost wages.

*Id.* at 1339.

For the reasons articulated by the Eighth Circuit, the Court finds the reasoning in *Welsh* to be both fair and reasonable.

2. *Right of Reimbursement Agreement*

[11] Finally, Plaintiff asserts that § 3.06 of the USC Plan should be understood in light of the Right of Reimbursement Agreement he entered into with USC, and which was drafted by USC, within its capacity as the Plan Administrator. (Pl.'s Mot. 2, 4, 12; Petit Deck, Ex. B p. 35.) The Right of Reimbursement Agreement includes the following language:

> In connection with an illness or injury, I have applied for benefits for myself. In return for payment of these benefits, *if payments for the same illness or injury are received,* I acknowledge I am obligated to reimburse the plans 100% to the full extent of any net recovery.

(Pl.'s Mot. 4; Petit Deck, Ex. B p. 35) (emphasis added). To that end, Plaintiff claims: "This [A]greement expressly

---

**9.** Plaintiff explains that the Federal Employers' Liability Act ("FELA") is the equivalent of workers' compensation for federal or railroad employees not covered by state workers' compensation laws. (Pl.'s Mem. 9.)

states that the USC Plan will only be able to recover benefits which were overpaid because of a subsequent award of other benefits, when those benefits were paid for the 'same illness or injury' for which [USC] Plan benefits are being paid." (Pl.'s Mot. 2.) In response, Defendant argues that although "the language of the Right of Reimbursement Agreement [is] more limiting, it [does] not constitute an amendment of the [USC] Plan to allow double recovery of benefits and no authority is cited to that effect." (Def.'s Reply to Pl.'s Mem. 4.) The Court is mindful that reliance on the Right of Reimbursement Agreement is appropriate only if language in the USC Plan is found to be ambiguous. *See Gilliam*, 488 F.3d at 1194. Accordingly, to the extent that Plaintiff has not shown that the USC Plan is clearly ambiguous, so as to permit the introduction of extrinsic evidence (Pl.'s Supp. Brief 9), the Court declines to weigh the Right of Reimbursement Agreement as instructive.

### 3. *Defendant's Arguments*

Principally, Defendant argues that the offsets at issue were appropriately taken because the workers' compensation award for the County Injury covered the same period of time of disability that Plaintiff was to receive benefits under the USC Plan. (*See generally* Def.'s Opp'n.) Indeed, the workers' compensation award for the County Injury was intended to cover onward for 418.25 weeks (over eight years) from March 7, 2002, and Plaintiff's benefits under the USC Plan were to begin in November 2002. (Def.'s Opp'n 16.) In other words, Defendant argues that the USC Plan permits offsets for benefits re-

ceived for the same period of time of disability. (*See generally* Def.'s Opp'n.) In response, Plaintiff asserts that if Defendant "wanted the [USC] Plan to read that offsets were permitted when payable 'for the same period of time' it should have written this language into the [USC] Plan." (Pl.'s Mot. 13.) The Court agrees that it is unreasonable to provide for offsets simply because two separate benefits are payable during the same period of time. *See Welsh*, 54 F.3d at 1338–39 (holding that "it would be entirely irrational to claim, for instance a right to setoff based on an award for an injured foot when the basis for an employee's entitlement to disability benefits was total incapacitation from a stroke unrelated in any way to the foot injury.").

Defendant also argues that Plaintiff suffered no injuries for the purported USC incident. (Def.'s SOF ¶ 37; Finding of Fact & Orders, Sept. 9, 2008.) Defendant cites the Workers' Compensation Administrative Board ("WCAB") opinion, which states: "[Plaintiff] did not sustain injury to his neck, left shoulder, left upper extremity, eye psyche, hypertension and internal [sic] arising out of an occurring in the court [sic] of employment on 9/20/01." [10] (Def.'s SOF ¶ 37; *see* Findings of Facts and Orders, Sept. 9, 2008.) In response, Plaintiff asserts: "the USC workers' compensation opinion did not find that [Plaintiff] had not been injured in his neck and shoulder. It only found that this injury was not 'arising out of an [sic] occurring in the course of employment on 09.20.10[sic]. There are obviously other ways to sustain this injury than while at work." [11] (Pl.'s

---

**10.** The Honorable Gail Babcock, WCAB Judge held that Plaintiff "did not sustain injury arising out of and occurring in the course of employment to his neck, left shoulder, left upper extremity, eyes, psyche, hypertension, and internal." (Findings of Facts and Orders, Sept. 9, 2008.) Though, Defendant provides no support for why a workers' compensation

opinion is entitled to deference, and consequently, why the Court should rely on it.

**11.** "[T]he fact that [a] claimant was initially found disabled under the terms of the plan may be considered evidence of the claimant's disability, but as the Eighth Circuit stated in *McOsker v. Paul Revere Life Insurance Compa-*

Reply 9.) More importantly, however, Plaintiff further argues that once litigation begins, Defendant is necessarily limited to those arguments made during administrative proceedings, of which this is not one, and to which the Court later turns. (Pl.'s Reply 8; Pl.'s Supp. Brief 3.) Regardless of whether Defendant is precluded from making this argument because it was not raised during administrative proceedings, however, Defendant has failed to persuade the Court that the workers' compensation opinion should be afforded any weight.

Finally, Defendant argues that the USC Plan is only intended to supplement other benefit sources:

> The principal purpose of the USC Long–Term Disability Benefit Plan is to financially aid Participants in the event of a Total Disability, as defined in the Plan. This [USC] Plan does not replace other disability benefit sources which are available to Participants, such as Social Security, State Disability, or Workers' Compensation. This [USC] Plan provides a benefit supplement to such other benefit sources.

(Def.'s Addtn'l Trial Brief 6.) Defendant therefore contends that "the [USC] Plan was to be a supplement to other benefit sources and not a primary benefit connected to one injury or disease or another to the exclusion of others." (Def.'s Addtn'l Trial Brief 6.) Defendant asserts that Plaintiff's injuries "must be addressed separately before one can determine whether an offset for Workers' Compensation benefits paid covering the same period of benefit payments under the [USC] Plan can be taken is unreasonable and strained." (Def.'s Addtn'l Trial Brief 6.)

In any event, for the reasons that the Court finds Plaintiff's interpretation of the USC Plan persuasive, Defendant's arguments are unpersuasive.

### E. Additional Procedural Deficiencies

▇▇▇▇ "An administrator must provide a plan participant with adequate notice of the reasons for denial, 29 U.S.C. § 1133(1), and must provide a 'full and fair review' of the participant's claim." *Abatie,* 458 F.3d at 974; *see Robinson v. Aetna Life Ins. Co.,* 443 F.3d 389, 393 (5th Cir. 2006) ("Section 1133 requires an administrator to provide review of the specific ground for an adverse benefit decision."); *see Juliano v. Health Maint. Org. of New Jersey, Inc. (Juliano),* 221 F.3d 279, 288 (2d Cir.2000). "By requiring that an administrator notify a claimant of the reasons for the administrator's decisions, the statute suggests that the specific reasons provided must be reviewed at the administrative level." *Abatie,* 458 F.3d at 974. As the Ninth Circuit explained, "an administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale for review, and contravenes the purposes of ERISA. This procedural violation must be weighed by the district court in deciding whether [the defendant] abused its discretion." *Id.* (holding that "[w]hen an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures."); *see Jebian v. Hewlett–Packard Co. Emp. Benefits Org. Income Prot. Plan,* 349 F.3d 1098, 1104 (9th Cir.2003) (internal citations omitted) ("Also, a contrary rule would allow claimants, who are entitled to sue once a claim had been 'deemed denied,' to be

---

*ny* [279 F.3d 586 (8th Cir.2002)], we are not suggesting that paying benefit operates forever as an estoppel so that an insurer can never change its mind." *Muniz,* 623 F.3d at 1296–97.

'sandbagged' by a rationale the plan administrator adduces only after the suit has commenced."). Therefore, in *Jebian*, the Ninth Circuit concluded that "[the defendant's] refusal to subject claimants to that eventuality parallels the general rule that an agency's order must be upheld, it at all, on the same basis articulated in the order by the agency itself, not a subsequent rationale articulated by counsel." *Jebian*, 349 F.3d at 1104.

Here, Plaintiff asserts: "During the administrative proceedings in this case, Sedgwick's sole justification for taking the offsets was that the workers' compensation benefits were paid over the same period as the disability payments." (Pl.'s Supp. Brief 3.) To that end, Plaintiff argues: "the current 'same injury' argument was neither raised in the initial denial letter, nor in the uphold letter on appeal. Rather, the USC Plan waited until well after litigation commenced to raise it," such that "this argument is waived." (Pl.'s Reply 2, 8, 12; Pl.'s Reply to Def.'s Trial Brief 5; Pl.'s Supp. Brief 3.) Plaintiff also argues that it was not afforded a "full and fair" review of an adverse benefit determination, pursuant to 29 C.F.R. § 2560.503–1(h)(1). (Pl.'s Opening Trial Mem. ("Pl.'s Mem.") 7.) Finally, Plaintiff claims that the October 28, 2008 Letter was an "adverse benefit determination" because it resulted in a reduction of benefits. 29 C.F.R. § 2560.503–1(m)(4); Pl.'s Mem. 7. As such, Plaintiff asserts that the USC Plan should have provided him with "a description of the [USC] [P]lan's review procedures and the time limits applicable to such procedures." 29 C.F.R. § 2560.503–1(g)(1)(iv). Yet, Plaintiff complains that "[t]he October 28 [2008] [L]etter made no attempt whatsoever to do this." (Pl.'s Mem. 7.) Plaintiff appealed, thereby providing Sedgwick "with a copy of the Reimbursement Agreement," which Plaintiff asserts, "clearly indicated that the offset should only be taken for other benefits as a result of the 'same injury or illness.'" (Pl.'s Mem. 7.) Plaintiff argues that Sedgwick's January 12, 2009 response denying his appeal: (1) failed to refer to the "specific plan provisions on which the benefit determination is based;" (2) failed to inform Plaintiff of his right to receive and inspect documents; (3) failed to inform Plaintiff of the right to bring an action under § 502(a) 29 C.F.R. § 2560.503–1(j)(4); and (4) failed to include the mandatory statement that Plaintiff could contact his state insurance regulator of the Department of Labor ("DOL"). (Pl.'s Mem. 7.)

■ The Court declines to address Defendant's arguments that were not raised during the administrative proceedings, pursuant to *Jebian*. See *Jebian*, 349 F.3d at 1104. Defendant is therefore limited to arguing that it was entitled to take offsets from the workers' compensation benefits, which were paid over the same period as the USC Plan payments, because it argued this during the administrative proceedings. However, as already explained, the Court finds this argument unpersuasive in light of the plain language of the USC Plan, as well as in light of the well-formulated reasoning in *Welsh*. Nonetheless, the Court now turns to whether Plaintiff has met his burden in establishing that he suffered two separate and distinct injuries, for purposes of the USC Plan.

### F. Same Injury or Illness

As explained above, the purpose of the USC Plan's offset provision is clear; it exists to prevent a claimant from receiving a double recovery for the same loss or injury. Thus, Plaintiff must show that he sought benefits for a separate and distinct injury suffered while working for USC. If Plaintiff provides evidence that he suffered two separate and distinct injuries (one for the County Injury, and one for the USC Injury), the burden shifts to Defendant to

show otherwise. *See Jebian*, 349 F.3d 1098, 1109 (finding that contrasting evidence regarding the participant's pain and surgeries created a fact issue as to whether he was able to perform duties, and therefore, precluded summary judgment in his ERISA action against the plan challenging denial of long-term benefits).

Plaintiff argues that the workers' compensation award for the County Injury is "clearly for a different 'loss' than the USC disability award, as it was awarded for an injury that pre-dated [Plaintiff's] employment at USC and his coverage under the USC Plan." (Pl.'s SOF ¶ 21; Pl.'s Reply 7; Pl.'s Mem. 11; Petti Decl., Ex. B p. 63.) Plaintiff asserts that the workers' compensation award for the County Injury was based on a physical injury to his lower back and leg, "while the disability from USC stemmed from an injury to his cervical spine (i.e. neck), as well as hypertension and depression." (Pl.'s Reply 8.) To that end, Plaintiff claims that the County Injury award was intended to compensate him for his reduced future earnings capacity, whereas the "current [USC] Plan benefits are intended to compensate him for being unable to work at all." (Pl.'s Reply 14.) Plaintiff relies on the medical findings of Dr. Rah, which found that the County Injury caused injury to his lumbar spine and left leg. (Petti Decl., Ex. B p. 63.) Dr. Rah stated on November 27, 2001:

> Since last being seen, the patient did undergo the (IDET) lumbar thermal diskoplasty procedure on October 26, 2001. It has been approximately one month since the (IDET) lumbar thermal diskoplasty procedure. So far, he has not experienced any substantial improvement in his lower lack or lower extremity symptoms. He has not been working.

(Fairman Decl. Ex. 9.) Plaintiff asserts that by contrast, the USC Injury related to his cervical spine, hypertension and depression, and which Dr. Kramer explained: "Patient has been experiencing headaches, unstable blood pressure, anxiety and depression, blurred vision with neck pain and tachycardia which makes it very difficult for him to perform his normal work duties." (Petti Decl., Ex. B p. 52.)

In response, Defendant argues that "[t]he distinction of the different injury and injury predating the claim against the [USC] Plan ignores the fact that [P]laintiff relied on all the medical evidence in the administrative file to seek benefits from the [USC] Plan." (Def.'s Opp'n 16.) Defendant asserts that "Plaintiff was not found to have suffered an upper body injury in the WCAB proceeding he brought against USC." (Def.'s Trial Brief 14.) Defendant further contends that Plaintiff "artfully prepared separate reports minimizing the County [I]njury claim on the USC report and the reverse on the County [I]njury report." (Def.'s Trial Brief 14.) Defendant states:

> [T]he faint claims and exaggerated complaints arising from the USC WCAB claim relied largely on "internal perspective(s) only" and "in home blood pressure testing" not found by the treating physician and led the WCAB judge to find that no injury and thus no disability arose from the USC [I]njury claim.

(Def.'s Opp'n 16.) Defendant further states:

> One of Plaintiff's recurring complaints relating to the [USC] Plan claim was that he suffered from elevated blood pressure reportedly caused by the event taking place on September 20, 2001 at USC. In a typical report of elevated blood pressure by [P]laintiff, he complained of elevated blood pressure from in-home testing but none was detected by the examining physician.

(Def.'s SOF ¶ 36.) Defendant additionally complains: "The distinction between the

USC [I]njury and the County [I]njury predating the claim against the [USC] Plan ignores the fact that Plaintiff relied on all the medical evidence in the administrative file to seek benefits from the [USC] Plan." (Def.'s Trial Brief 15; Def.'s SOF ¶ 35.) As such, Defendant asserts: "[a] review of the records fails to disclose anything to contradict the findings of the WCAB judge when no injury or disability was found. The County [I]njury ... produce[d] significant injury which cause[d] [P]laintiff to become unable to work after November 6, 2001, and produce [sic] a WCAB award for disability from March 2002 award." (Def.'s Trial Brief 16.)

Finally, Defendant contests that Plaintiff could sustain the County Injury only a few weeks before the USC injury, and still claim that it is "somehow a different and exempt injury when it comes to determining offsets under the USC Plan benefits." (Def.'s Trial Brief 9; Def.'s Reply to Pl.'s Mem. 3.) Defendant states: "[n]o such restrictive language appears in the [USC] Plan that would allow you to separate an injury from the disability that it caused," and that "[t]he upper body disability versus lower body disability argument is distracting, but should not be persuasive given the true facts of the case." (Def.'s Trial Brief 9; Def.'s Reply to Pl.'s Mem. 4.)

It is clear that the parties dispute whether Plaintiff suffered two separate and distinct injuries. Plaintiff relies on the medical findings of Drs. Rah and Kramer, which indicate that he suffered injury to his lower back and leg while working for the County, and then sustained disability while working at USC, stemming from an injury to his cervical spine, as well as hypertension and depression. (Petti Deck, Ex. B pp. 52, 63.) Defendant seemingly concedes that Plaintiff suffered an injury while working at USC to the extent that it paid Plaintiff benefits, beginning in November 2002. (Petti Deck, Ex. B pp. 52, 63.) Defendant now argues, though, that Plaintiff suffered no injury while he was working at USC, meaning that Plaintiff suffered only one injury, the County Injury.[12] However, Defendant provides only vague and generalized attacks on Plaintiff's evidence, as well as on Plaintiff's credibility. (Def.'s SOF ¶¶ 1–6, 35–37.) Defendant further provides no evidence or support for why this District Court should adopt the WCAB judge's findings. Even more, Defendant provides no medical reports contradicting the findings of Drs. Rah and Kramer, which indicate that Plaintiff clearly suffered two separate and distinct injuries.[13] Thus, without more, Defendant has failed to rebut Plaintiff's assertion that he suffered two separate and distinct injuries.

Accordingly, the Court finds that Plaintiff has met his burden of proof in establishing that he suffered two separate and distinct injuries and his Motion for Summary Judgment is **GRANTED** to the extent that it seeks to find that Defendant's offsets were improper.

### III. *RULING*

For the reasons stated above, Plaintiff Steven Dunner's Motion for Summary Judgment is **GRANTED.** The Court de-

---

12. The Court notes that this argument did not originally serve as the basis for offsetting Plaintiff's benefits. (Petit Deck, Ex. B pp. 31, 44–45, 54–55.) Rather, as explained above, it was only later proffered by Defendant. (*See* generally Def.'s Opp'n.)

13. The Court notes that the Order of December 18, 2009 expressly requested that the parties provide the Court with additional support for their respective positions, but which Defendant has failed to do to the extent that it has not provided any evidence that Plaintiff's injuries were not separate and distinct. (*See* Order of Dec. 12, 2009.)

clines to adopt Defendant's interpretation of the USC Plan, and instead adopts Plaintiff's fair and reasonable interpretation of the USC Plan, which is that it is intended to prevent claimants from receiving a double recovery. To that end, the Court finds that Plaintiff has proven that he has suffered two separate and distinct injuries (the County Injury and the USC Injury), such that Defendant's offsets were improper. Plaintiff is ordered to file a proposed Judgment on or before **MARCH 14, 2011.** Plaintiff is also ordered to file a motion for attorneys' fees on or before **April 4, 2011.** *See Smith v. CMTA–IAM Pension Trust,* 746 F.2d 587, 589 (9th Cir.1984). Failure to do so may result in the Court declining to award attorneys' fees.

IT IS SO ORDERED.